Veronika AYRIYAN

v.

Daniel AYRIYAN.

Nos. 2009–29–Appeal, 2009–30–Appeal.

Supreme Court of Rhode Island.

May 10, 2010.

Thomas M. Dickinson, Esq., for Plaintiff.

Alan T. Dworkin, Esq., Warwick, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Before this Court is an appeal by Veronika Ayriyan from orders of the Family Court awarding Daniel Ayriyan full custody of their minor children and denying her motion to vacate the order of the Family Court entered on September 4, 2007. This case came before the Court for oral argument on April 8, 2010, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the parties' arguments and considering the memoranda submitted by them, we are satisfied that cause has not been shown, and we proceed to decide this appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the orders of the Family Court.

## I

### Facts and Travel

There are very few facts in this case that are not in dispute. The parties, Veronika and Daniel Ayriyan, do agree that a marriage ceremony took place in Portland, Maine, on February 12, 1999, and that they subsequently divorced on July 17, 2001.[1] It is also undisputed that Veronika was seventeen years old at the time of the marriage, and Daniel, Sr. was twenty-six years old. They have two children, Daniel, Jr., born in 1999, who is ten years old, and Rafael, born in 2004, who is five years old. The couple also acknowledges that they reconciled for several years after their divorce, during which time Rafael was born. They agree that the reconciliation ultimately failed, and that Veronika moved out of the family home in January 2005, although they disagree on the specific date. Beyond this paucity of common ground, the parties can agree on little else.

However, in spite of, or more likely because of, their deeply held differences,

---

1. In this opinion, we refer to the parties as Veronika and Daniel, Sr. This is for the purposes of clarity only, and we intend no disrespect by using their first names.

Veronika and Daniel, Sr.'s most significant point of agreement is that the shared physical placement of their children is not appropriate. The parties successfully shared custody of their children for about a year until early 2007, when their troubles were reignited. On February 20, 2007, after picking up Daniel, Jr. and Rafael from visitation with their father, Veronika called the Attleboro, Massachusetts, police and alleged that she observed redness on Daniel, Jr.'s face and bruises on his body. The incident report prepared by the responding officer attributes the source of those injuries to Daniel, Sr.'s brother, Levon. The responding officer advised Veronika to take the child to Sturdy Memorial Hospital. According to the report of the hospital, Daniel, Jr. said that his uncle had struck him on his left buttock and on the right side of his face.

On February 21, 2007, Veronika filed a complaint and sought a protective order in District Court in Attleboro, Massachusetts, where she was living at the time. In an affidavit accompanying her complaint, Veronika alleged that Daniel, Sr. slapped Daniel, Jr. on the face with his hand, and that his brother, Levon, was responsible for Daniel, Jr.'s bruises. The Massachusetts Department of Social Services conducted an investigation and made a finding that Daniel, Sr. had excessively disciplined Daniel, Jr. The case then was referred to the Rhode Island Department of Children, Youth and Families (DCYF), which disagreed with the conclusion of the Massachusetts Department of Social Services that Daniel, Sr. had engaged in excessive discipline; DCYF determined that the allegations were unfounded.

On February 26, 2007, Daniel, Sr. filed a motion for emergency relief in Family Court. He alleged that Veronika had endeavored to prevent the exercise of his parental rights, and he cited Veronika's action in Attleboro District Court. Among other requests for relief, he sought sole custody of their children, the reappointment of a guardian *ad litem*, and a finding of contempt against Veronika, with appropriate sanctions.

On March 9, 2007, Veronika filed a motion for *ex parte* relief, seeking a temporary restraining order against Daniel, Sr. In an accompanying affidavit, she alleged physical abuse of Daniel, Jr. by his father and also that Daniel, Sr.'s motion filed on February 26 contained "many significant misrepresentations." On the basis of these allegations, a justice of the Family Court issued an emergency *ex parte* order that temporarily required that Daniel, Sr.'s visitation be supervised and temporarily restrained Daniel, Sr. from "harassing" Veronika.

The trial justice also reappointed attorney Janice Head as the guardian *ad litem* for the couple's two children.[2] Soon after her reappointment as guardian, Ms. Head investigated the parties' living conditions and submitted a preliminary report to the Family Court on April 13, 2007. After a hearing was held before the trial justice on April 16, 2007, the trial justice reinstated unsupervised visitation between the children and Daniel, Sr. and established a visitation schedule.

On July 5, 2007, Daniel, Sr. filed a motion for emergency relief, in which he alleged that his children's living arrangement with their mother and her boyfriend was harmful to them, and he sought physical placement of his children, subject to Veronika's visitation rights. A hearing

**2.** Ms. Head previously had been appointed as the guardian *ad litem* for the children in 2005.

was held on July 11, 2007, resulting in an order reinstating shared physical possession, and the matter was subsequently continued for review until mid-August. After an in-chambers conference among counsel for the parties and the guardian held on August 16, 2007, the trial justice issued an order, dated September 4, 2007, which awarded Daniel, Sr. physical possession of the parties' two children and continued the matter for a hearing on October 4, 2007. Veronika filed a petition for a writ of certiorari with this Court on August 29, 2007, in which she sought review of that order, which was made without an evidentiary hearing to supplement the recommendations of the guardian *ad litem*. This Court entered an order that directed the Family Court to conduct an evidentiary hearing forthwith.

In compliance with our order, the Family Court conducted evidentiary hearings on the issue of custody and placement over several days in September, October, and November, 2007. Several witnesses were called to testify, in addition to the parties, including the guardian *ad litem*, the boys' pediatrician, a child psychologist who examined the parties and Daniel, Jr., a former coworker of Veronika, and Veronika's fiance, Todd Quinter. The hearings revealed divergent testimony among Daniel, Sr., Veronika, her fiance, and the guardian.

Ms. Head testified that when she conducted her investigation of the parties' living arrangements in March 2007, Veronika was living in Attleboro, Massachusetts, with her fiance, her younger brother, and her two sons. As of the date of the hearing, she said that Veronika had moved, and was living in Smithfield, Rhode Island, in a nice home and that she "didn't see any evidence that [her fiance] was living there" when she visited. According to the guardian, however, Veronika told her that after she moved to Smithfield, "she was living with her boyfriend and had been for some months before that." The guardian testified that there was no indication that Daniel, Sr. had either a wife or girlfriend.

In her report, the guardian recommended to the Family Court that the children should be placed with their father. In her testimony, she said that she felt that it was most appropriate for the children to live with their father "because of the lack of [Veronika's] fostering [of a] relationship between the children and their father, and because my belief is that [Veronika] has been pressuring Daniel[, Jr.] to say certain things to certain people." Ms. Head also recounted several episodes that were of concern to her that decreased her confidence in Veronika. She discussed an incident in which Veronika contacted the Attleboro police on January 7, 2006, because she thought that Daniel, Sr. was driving by her house, although no charges were filed. According to Ms. Head, Daniel, Sr. informed her that he was at home sleeping at the time. The guardian testified that Veronika's report of alleged abuse of Daniel, Jr. by Daniel, Sr. on February 20, 2007, also factored into her recommendation. She said that she particularly considered the discrepancies between the police and hospital records reporting that Daniel, Jr.'s uncle was solely responsible, and Veronika's subsequent assertion in Attleboro District Court that Daniel, Sr. was responsible for the boy's injuries, as well.[3]

**3.** Boris Skurkovich, M.D., the children's pediatrician, examined Daniel, Jr. on February 28, 2007. He testified that the child had bruises, but that they were "mostly old," with the exception of a new bruise under the right shoulder blade. According to Dr. Skurkovich, Daniel, Jr. was "inconsistent" about where he sustained his various bruises; he testified that Daniel, Jr. attributed one bruise

Next, she expressed her concern about a notation placed in Daniel, Jr.'s school records at the request of Veronika that no information was to be given to Daniel, Sr. The guardian said that she believed this to be inappropriate because the parties had joint custody at that time. Ms. Head also was alarmed by obscenities that eight-year-old Daniel, Jr. wrote on his school desk, in which he disparaged himself. She suspected that Rafael, who was also swearing in English, and Daniel, Jr. learned these offensive words from Veronika's fiance. She also was deeply troubled by Daniel, Jr.'s assertion that he saw his mother and her fiance being inappropriately affectionate, which made him very upset to the point of declaring that it made him want to die. Overall, Ms. Head testified that she perceived "a clear pattern that [Veronika] is attempting to disrupt the relationship the children have with [Daniel, Sr.]," while she did not detect such a destructive effort on the part of Daniel, Sr.

In their testimony at the hearings, both Veronika and Mr. Quinter adamantly denied the conduct that the guardian attributed to them. They each testified that they purposely did not display any signs of affection in front of the children. According to Mr. Quinter, he never taught the children any swear words, nor had he used inappropriate language in their presence. He also testified that he did not live with Veronika and that he had not lived with her in the past.

Veronika, who emigrated from Russia to the United States as a teenager, testified to a harrowing tale of her marriage at seventeen years of age, a marriage that she characterized as arranged. According to Veronika, Daniel, Sr. raped her while they were dating, and she became pregnant. In his testimony, Daniel, Sr. denied raping Veronika. She said that the parties went to Maine to marry because they believed that state did not require parental consent for an individual under the age of eighteen to marry, and she wished to conceal the out-of-wedlock pregnancy from her parents.[4] Veronika also recounted being required to turn her paychecks over to her mother-in-law and having a poor relationship with her ex-husband's parents.

Finally, Veronika testified about a claimed incident of abuse that immediately preceded the parties' separation and eventual divorce. According to Veronika, Daniel, Sr. pushed her and sat on her chest, causing her "horrible pain." She said that he called her names and banged her head on the floor. Veronika testified that even though her husband had physically abused her before, she called the police for the first time after this incident. It appears from the record that Daniel, Sr. was convicted of one count of domestic assault in District Court and subsequently appealed his conviction to the Superior Court.[5] The record further reveals that Veronika declined to participate in a second trial, and the case against Daniel, Sr. was dismissed.

Daniel, Sr. said that he lived in Warwick, and his parents assisted him with child care. He testified about his flexible work schedule, that he mostly speaks Rus-

---

to being hit by his uncle and others to falling down.

4. In contrast to Veronika's testimony that her parents did not consent to her marriage, Daniel, Sr. produced their marriage license from Portland, Maine, as an exhibit, which contained the purported signatures of her parents.

5. Rule 37 of the District Court Rules of Criminal Procedure provides in relevant part that "[a] defendant aggrieved by a sentence of the District Court may appeal therefrom to the Superior Court * * *."

sian with his children, and that he does not swear in front of his children. According to Daniel, Sr., he deliberately spoke positively about Veronika to Daniel, Jr. and Rafael.

Brian Hayden, Ph.D., a child psychologist, testified that he had been counseling Daniel, Jr. at the referral of the guardian. He said that upon his first meeting with Daniel, Jr. and Daniel, Sr., several months earlier, Daniel, Jr. "seemed confused." He observed that the child was very affectionate with his father, and that the boy denied that his father ever hit him. According to Dr. Hayden, Daniel, Jr. told him that his mother's boyfriend "says a lot of 'bad things' about his dad." [6] However, he testified that Daniel, Jr. appeared "torn" between his parents and was anxious and inconsistent.

Doctor Hayden also conducted psychological evaluations of both parties. He testified that he found Veronika to be "vivacious" and "intelligent," but that she displayed a "histrionic personality." After interviewing and testing Daniel, Sr., Dr. Hayden said that he described him as "bright" and "methodical." Doctor Hayden testified that he deliberately tested Daniel, Sr.'s expression of anger in light of the allegations of abuse against him, and Dr. Hayden found that Daniel, Sr. exhibited "a below average level of aggression and dominance."

On April 2, 2008, the trial justice rendered her decision. She agreed with the parties "that an award of joint custody would be contrary to the best interest of Daniel, Jr., and Rafael." As a result, the trial justice awarded Daniel, Sr. "sole custody of the children as well as sole physical placement." She then proceeded to specify Veronika's visitation rights, including alternating weekend visitation, sharing of significant holidays, alternating visitation on other holidays, and two nonconsecutive weeks of summer vacation. The decision also vacated the order restraining Daniel, Sr.'s brother, Levon, from being in the children's presence. Finally, the trial justice found Veronika "in willful contempt of the orders of this court" for seeking and obtaining temporary restraining orders from Massachusetts courts that "directly impacted [Daniel's] access to his children" even though "Rhode Island was declared the home state of the children." The order memorializing the decision was entered on June 24, 2008, from which Veronika timely appealed.

After she appealed this decision, Veronika moved to vacate the September 4, 2007 order. A hearing before the trial justice on the motion was heard on July 22, 2008, and the trial justice denied the motion. [7] Veronika also filed a notice of appeal from the denial of the motion to vacate. The two appeals were consolidated for briefing and argument before this Court.

## II

### Issues on Appeal

Veronika raises three issues on appeal. First, she argues that the trial justice erred when she awarded full custody of the children to Daniel, Sr. Second, she contends that the trial justice erred when she found Veronika to be in contempt of the August 2002 order because she sought protective orders in Massachusetts courts.

---

6. Daniel, Jr. and Rafael often referred to Todd Quinter as "Brian." Mr. Quinter insists that he has never gone by the name "Brian," and he said that neither Daniel, Jr. nor Rafael ever has called him that.

7. Veronika then made a request for emergency relief to this Court for an order vacating the Family Court order of September 4, 2007, and reinstating the order entered on March 3, 2006, which was denied.

Third, Veronika asserts that the trial justice erred when she denied her motion to vacate the order of September 4, 2007.[8]

## III

## Analysis

### A

### Award of Custody

#### 1

#### Standard of Review

 "This Court's standard of review on the issue of custody and the best interests of the child is limited to whether the trial justice abused [her] discretion in making a particular custody award." *Berard v. Berard*, 749 A.2d 577, 579 (R.I.2000) (citing *Pettinato v. Pettinato*, 582 A.2d 909, 914 (R.I.1990)). When applying this standard, we "will not disturb findings of fact made by the Family Court on the issue of custody and the best interests of the child unless the trial justice abused her discretion in making a particular award." *McDonough v. McDonough*, 962 A.2d 47, 52 (R.I.2009) (citing *Berard*, 749 A.2d at 579). Therefore, "[a]n award will be affirmed unless the trial justice's factual findings overlooked or misconceived material evidence or were clearly wrong." *Id.* (citing *Berard*, 749 A.2d at 580).

#### 2

#### Discussion

 "It is well-settled. that the best interests of the child remain the 'lode-star principle' for determining child custody awards." *Berard*, 749 A.2d at 579 (quoting *Sammataro v. Sammataro*, 620 A.2d 1253, 1254 (R.I.1993)). When she determined what award of custody served the children's best interests, the trial justice was obligated to consider the factors set forth by this Court in *Pettinato*, 582 A.2d at 913–14.[9] *Horton v. Horton*, 891 A.2d 885, 892 (R.I.2006). In applying the factors, "[t]he best interests of the child should not be determined by assessing any one factor. The trial justice must consider a combination of and an interaction among all the relevant factors that affect the child's best interests." *Pettinato*, 582 A.2d at 914.

Veronika argues that the trial justice abused her discretion when she "substitut-

---

**8.** This issue is the sole basis of the second of these consolidated appeals. However, Veronika neither briefed nor argued the issue to this Court. Thus, Veronika has not provided "meaningful argument" before this Court on this appeal, and we will not consider its merits. *Manchester v. Pereira*, 926 A.2d 1005, 1015 n. 8 (R.I.2007) (reiterating "our well established rule that we will not substantively address an issue that was not adequately briefed") (citing *Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002)).

**9.** The factors that this Court set forth in *Pettinato v. Pettinato*, 582 A.2d 909 (R.I.1990), to be considered when determining the best interests of the child in custody disputes are as follows:

"1. The wishes of the child's parent or parents regarding the child's custody.

"2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

"3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.

"4. The child's adjustment to the child's home, school, and community.

"5. The mental and physical health of all individuals involved.

"6. The stability of the child's home environment.

"7. The moral fitness of the child's parents.

"8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent." *Id.* at 913–14.

ed the unsubstantiated conclusions of the [guardian] for a meaningful application of *Pettinato* based upon the evidence." Conversely, Daniel, Sr. maintains that the trial justice "carefully and precisely set forth in detail her consideration of the [*Pettinato* factors]" and conducted an "independent examination * * * that far transcends a bald reliance upon the testimony of the [guardian]." After careful review of the record, we agree with Daniel, Sr. and hold that the trial justice did not abuse her discretion when she awarded him custody of the couple's two minor children.

In her decision, which, in our view, very well could serve as a template for how such a decision should be written, the trial justice discussed each of the *Pettinato* factors in detail. With respect to the first two factors, the trial justice acknowledged that both parents sought sole custody and physical placement of their children and that the children's preferences were irrelevant because of Rafael's youth and Daniel, Jr.'s inability to provide a reliable preference. She then considered, in detail, the evidence that the parties presented concerning "the interaction and interrelationship of the child with the child's parents, siblings, and any other person who may significantly affect the child's best interest." The trial justice noted that Daniel, Jr. told Dr. Hayden that his mother and her fiance spoke badly of his father and suggested to him that he was abusive. She found, however, that young Daniel "denied any abuse at the hands of his father and never conveyed any fear of his father or any anxiety about being with him." The trial justice noted that the guardian recounted her concerns for Daniel, Jr.'s mental health because of his negative comments about himself, such as his expressions that he would like to die. The trial justice concluded that the child "is confused emotionally."

Further, the trial justice briefly discussed the children's adjustment to home, school and community. She noted Daniel, Jr.'s involvement in sports in both Warwick and Smithfield. However, she expressed concern with the conclusions of a psychologist's report prepared regarding Daniel, Jr. at his elementary school and Veronika's "fail[ure] to appear at the appointed meeting" to discuss the psychologist's recommendations.

Next, the trial justice discussed the mental and physical health of the family members. She found that Veronika "chose to weave a tale of rape and abuse," and that her psychological evaluation revealed that she is "a person unable or unwilling to tell the truth." The trial justice discussed multiple instances of "fabrications/exaggerations and misstatements made by [Veronika] that seriously strain her credibility as a witness." As for Daniel, Sr., the trial justice noted that his psychological evaluation "demonstrates that defendant is 'earnest, controlled and deliberate.'" She considered that his assessment did not show a propensity toward extreme forms of anger, but rather the evaluation "indicated a below average level of aggression."

The trial justice also found that both of the parties had stable homes, but that "[t]here is clear evidence that [Veronika] resides with her fiance and has for some time," despite Veronika and her fiance's testimony to the contrary. However, she held that "the court cannot be satisfied by clear and convincing evidence that Daniel, Jr. observed his mother and [her fiance] in a compromising position" because of his tendency to tell "contradictory stories regarding both his father and his mother." The trial justice also noted that "[t]here is no evidence that [Daniel, Sr.] has any women in his life."

After reviewing the instances of claimed domestic violence that Veronika urged her

to consider, the trial justice did "not find a pattern of domestic violence against [Veronika]." She noted that there was but one instance of domestic violence that had been established by a fair preponderance of evidence, and that occurred in 2000. The trial justice stressed that she took this incident "seriously," but she concluded that Veronika "has failed to establish a continuing pattern of threatening behavior."

With respect to the final factor, "the willingness and ability of each parent to facilitate a close and continuous relationship between the child and the other parent," the trial justice restated her finding that Veronika lacked the ability "to foster a relationship between the boys and their father." To support this finding, the trial justice cited the psychological evaluation conducted at Daniel, Jr.'s elementary school without notice to the father, the boy's consistent description of his mother's denigration of his father to him and his brother, "the constant interruption of the boys' relationship with their father by means of temporary restraining orders obtained contrary to RI Family Court orders," and her insistence that Daniel, Jr.'s elementary school withhold all information about Daniel, Jr. from his father. In contrast, she noted that there was no indication in the record that Daniel, Sr. denigrated Veronika to the boys at any time. The trial justice concluded that Veronika's "lack of credibility makes it impossible for the court to grant her any custodial rights to the minor children."

We are of the opinion that the trial justice did indeed "review all the evidence and exhibits when she weighed the factors set forth in *Pettinato*." Veronika argues that the guardian's recommendation was not adequately supported and that many of the trial justice's findings were "erroneous." However, this Court reviews the trial justice's award for an abuse of discretion and thus affords her findings of fact considerable deference. *Berard,* 749 A.2d at 579.

After careful review of the record, we do not agree with Veronika that the trial justice "substituted the unsubstantiated conclusions of the [guardian] for a meaningful application of *Pettinato* based upon the evidence." She obviously gave significant weight to the testimony and report of the guardian, but did not do so to the exclusion of other evidence. Rather, the trial justice carefully weighed all the evidence, including the testimony of the witnesses and documentary evidence such as police reports, hospital records, the pediatrician's report, educational records and reports, and the psychological evaluations conducted by Dr. Hayden. Further, the trial justice did not blindly accept everything in the guardian's report and testimony, as illustrated by her finding that certain portions were not supported by clear and convincing evidence. Therefore, in our view, the trial justice's award of sole custody and placement of the two children with Daniel, Sr. was made after she applied the *Pettinato* factors in a meaningful way, based on all of the evidence and her credibility determinations. We see no abuse of discretion in this record.

**B**

**Finding of Contempt**

**1**

**Standard of Review**

"A finding of contempt is within the sound discretion of the trial justice." *State v. Lead Industries Association, Inc.,* 951 A.2d 428, 464 (R.I.2008) (quoting *Durfee v. Ocean State Steel, Inc.,* 636 A.2d 698, 704 (R.I.1994)). Accordingly, upon review, "this Court will afford the trial justice great deference." *Nardone v. Ritacco,* 936 A.2d 200, 204 (R.I.2007) (citing *Direct Ac-*

*tion for Rights and Equality v. Gannon*, 819 A.2d 651, 661 (R.I.2003)). Therefore, we "will only overturn such findings where they are clearly wrong." *Id.*

### 2

### Discussion

"[T]he Legislature and this Court have recognized that the Family Court, although a statutory court, has inherent power to punish contempt of its authority." *Porter v. Porter*, 684 A.2d 259, 261 (R.I.1996). In our opinion, the trial justice did not abuse her discretion when she exercised this power and found Veronika to be in contempt of the August 2002 order. It is implicit in the trial justice's finding of contempt that she was convinced that Veronika's claims that served as the basis for the protective orders that she sought in Massachusetts court were merely pretextual. Additionally, "it is within the discretion of the court to impose sanctions for contempt." *Gardiner v. Gardiner*, 821 A.2d 229, 232 (R.I.2003) (quoting *E.M.B. Associates, Inc. v. Sugarman*, 118 R.I. 105, 109, 372 A.2d 508, 509–10 (1977)). Here, the trial justice, in her discretion, did not impose sanctions on Veronika. Therefore, after affording the trial justice's finding of contempt great deference, as we must, we cannot say that the trial justice's finding of contempt was clearly wrong, and we will not disturb it on review.

### IV

### Conclusion

We affirm the orders of the Family Court and remand the record of this case thereto.

Justice INDEGLIA took no part in the consideration or decision of this appeal.