44 A.3d 1260 (2012)
Beth A. DEPRETE
v.
Michael F. DEPRETE.
No. 2010-233-Appeal.
Supreme Court of Rhode Island.
June 19, 2012.
*1261 Nicholas L. Colangelo, Esq., Cranston, for Plaintiff.
Molly Kapstein Cote, Esq., Warwick, for Defendant.
Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

OPINION
Justice ROBINSON, for the Court.
The plaintiff, Beth A. DePrete, appeals from an order of the Family Court reflecting the court's denial of her motion seeking leave of court to relocate the parties' two minor children from Rhode Island to Texas and seeking modification of the final judgment of divorce to reflect same. On appeal, the plaintiff contends (1) that the justice of the Family Court who passed upon her motion abused his discretion, overlooked or misconceived the evidence, and was clearly wrong in finding that it was not in the best interests of the children to allow them to relocate to Texas; and (2) that, in determining whether relocation served the best interests of the children, the Family Court justice failed to properly apply the criteria set forth in this Court's opinion in Dupre v. Dupre, 857 A.2d 242 (R.I.2004).
This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that cause has not been shown and that this appeal may be resolved without further briefing or argument.
For the reasons set forth in this opinion, we affirm the order of the Family Court.

I

Facts and Travel
The parties to the case at bar were married on August 11, 2000, and two minor *1262 children were born of that marriage.[1] On March 20, 2007, the plaintiff filed for divorce on the ground of irreconcilable differences that she alleged had caused the irremediable breakdown of the marriage. A final judgment of divorce was entered on May 16, 2008; that judgment awarded joint custody of the children to the parties, with physical possession being granted to plaintiff and with defendant having all reasonable rights of visitation. In June of 2009, an order was entered which granted more extensive visitation rights to defendant during school vacations and the Summer months.
On August 6, 2009, defendant filed an ex parte emergency motion seeking an order enjoining and restraining plaintiff from permanently removing the children from Rhode Island without first obtaining the approval of the Family Court. The Family Court granted that motion.
Thereafter, on October 19, 2009, plaintiff filed the motion which is the focus of the instant appeal. That motion sought leave of court to relocate with the two minor children to San Antonio, Texas, and it sought modification of the final judgment of divorce to reflect same. As her reason for filing said motion, plaintiff stated that she had become engaged to Lieutenant Colonel Paul A. Longo (Colonel Longo), "an active duty dental officer in the United States Air Force," who was stationed in San Antonio. The plaintiff argued that the "general quality of life" of the parties' children would improve by their moving to Texas. In due course, defendant filed an objection to plaintiff's motion.
A hearing on plaintiff's motion was held by the Family Court over six days in February of 2010. The plaintiff presented three witnesses in support of her motion, and she also testified in support thereof. The defendant likewise testified in support of his objection, and he presented the testimony of one additional witness.

A

The Testimony of Lieutenant Colonel Longo
Colonel Longo was the first witness to testify on behalf of plaintiff. Colonel Longo testified that he had known plaintiff since 1995 and that he became engaged to her on July 3, 2009. Colonel Longo further testified that, as of the time of the hearing before the Family Court, he had been residing in San Antonio for approximately eighteen to nineteen months; he further stated that it was his second time living in San Antonio. Colonel Longo stated that he was an Air Force officer on active duty; he added that he had been on active duty for twelve years. He testified that he was stationed at Lackland Air Force Base in San Antonio and that he would be required to remain stationed at that base until August of 2012. Colonel Longo stated that he was currently serving as the "director of clinical prosthodontics for the United States Air Force" and was also the "regional prosthodontics consultant." He stated that his annual rate of pay at the time of the hearing was $160,000 and that, in addition to that salary, he received a monthly food allowance of approximately $158 and a monthly housing allowance of $1,343.
Colonel Longo further testified that he was a Rhode Island native and that "[a]ll of [his] extended family" lives in Rhode Island; he specifically noted that his parents and both of his sisters live in Rhode Island. Colonel Longo testified that he visits the members of his extended family in Rhode Island "[t]wo to three times a *1263 year" for periods varying from four days to one week.
Colonel Longo further testified at the February 2010 hearing that he had plans to be married to plaintiff on July 10 of that year.[2] He stated that, upon marrying plaintiff, his monthly housing allowance would increase to $1,600 and that plaintiff and her children would become eligible to benefit from his medical insurance. He testified that it was his belief that the medical insurance would be provided to them at no extra cost. He further testified that, once plaintiff and he were married, she and her children would become eligible to benefit from his dental insurance, although he would be required to make an additional monthly payment of $39 for the dental insurance. Colonel Longo also testified that he owned the three-bedroom house in which he resided in San Antonio. He stated that the house was located in a community with a homeowners' association; he said that the association provided certain amenities to its membersincluding a playground, a basketball court, a swimming pool, and a recreation center.
Colonel Longo testified that he and plaintiff had twice traveled to Texas with her two children. He further testified that he had also spent time with the children in Rhode Island. With respect to his relationship with the two children, Col. Longo described that relationship as follows:
"Positive. It's a work in progress. Every time I come home, I feel like I get to know them a little better and they know me a little better."
He then proceeded to list several activities that he and the children had engaged in during his visits to Rhode Island.
Colonel Longo testified that, if the court were to grant permission for the relocation of the children, he would "have no problem" with the children traveling with plaintiff to Rhode Island for the purpose of facilitating the children's relationship with defendant; he added that in fact he "would encourage it." With respect to his observations of the relationship between plaintiff and the children, Col. Longo stated:
"They are very close. They have a great relationship. They open up to their mother. Beth does an amazing job taking care of them."
In response to a question posed by plaintiff's attorney concerning what he would deem his role to be with respect to the children upon marrying plaintiff, Col. Longo testified as follows:
"Well, as a stepparent or stepfather, I am certainly not trying to take the place of [defendant]. He will always be their father and I will respect and honor that. I see my role as a mentor, a role model for the children, friend and a male figure on whom they can rely."
On cross-examination, Col. Longo acknowledged that he did not have a guarantee or agreement with the military that he would remain in San Antonio after his current assignment. He acknowledged that, after his present four-year term in San Antonio comes to an end, he could not "personally control the [next] assignment" and that it would be his "boss" who would determine his next assignment. He further testified that he would "make every attempt" to remain in San Antonio after the expiration of his current assignment, and he added that there were "other assignments within the city." Later in his testimony, Col. Longo elaborated that there are only forty-five prosthodontists in *1264 the Air Force and that they tend to "go to bigger Air Force bases;" he added that there are "about thirteen locations within the continental United States." Colonel Longo also acknowledged that, on reassignment, he could be sent to Alaska, Hawaii, Japan, or England.
Colonel Longo further acknowledged on cross-examination that neither he nor plaintiff had any relatives in Texas. With respect to his relationship with plaintiff, he stated that, between the point in time when he began talking with plaintiff on the telephone (February of 2009) and the date on which she and he became engaged (July 3, 2009), he had visited Rhode Island "about five times." He further testified that, once he retired, he planned on moving back to Rhode Island.[3] Colonel Longo also testified that, if the children were not permitted to relocate to Texas, he and plaintiff had agreed that they "would certainly get married and continue seeing each other * * *."

B

The Testimony of Plaintiff
The plaintiff herself was the next witness to testify at the hearing. She testified that she had "been the primary caretaker" of her two children and that "they have resided with [her] all of [the] time." With respect to her day-to-day involvement with the children, plaintiff testified that it was her responsibility to "get [them] up and ready for school," to feed and dress them, to "get them to school," and then to pick them up after school. She further testified that she makes supper for the children and that they then eat together; she added that, after supper, she helps the children with their homework or projects. The plaintiff also testified that she helps guide the children at every opportunity as to "how to communicate effectively;" she added that she disciplines them when necessary. The plaintiff also stated that she reads with the children every evening.
With respect to the children's visitation schedule with their father, plaintiff testified that she and defendant had the children on alternate weekends.[4] The plaintiff further testified that the children have telephone contact with their father "[i]f not nightly, [then] every other night."
The plaintiff testified that, on the weekends when she has the children, she attends their sporting events and goes to their Cub Scout activities with them; she added that they also "get together with family members" and attend church on most Sundays. Later in her testimony, when asked about her relationship with her children, plaintiff testified as follows:
"I know my children inside and out and I am able to recognize when there might be something bothering them or when they might be nervous or anxious about something, and I have a really good way of talking with children and putting them at ease."
As to her occupation, plaintiff testified that she was employed by the Narragansett School System as a full-time teacher; she added that she had been a teacher for ten years. The plaintiff further testified that her annual salary as of the time of the hearing was $53,000. With respect to her career plans if she were to relocate to Texas, plaintiff testified that it was not her intention to seek full-time employment immediately *1265 after relocating. The plaintiff stated that, if she were to relocate, she intended to further pursue her Master's degree; she noted that, by contrast to what would happen if she were to pursue her Master's degree in Rhode Island, in Texas she would be able to attend day classesthereby making it unnecessary for her to take time away from her children. The plaintiff stated that, if she were to obtain her Master's degree, her salary as a teacher would increase by $4,000 to $5,000 per year.
The plaintiff also testified about the schools that the children would be attending if they moved to Texas; she stated that she met with the principal of the elementary school which her younger son would be attending if they were to move. The plaintiff testified that that school was "exemplary," that it was "a state-of-the-art facility," and that she had looked at the test scores to ensure "that it's a high-performing school." She further testified that she was "planning to visit" the school that her older son would be attending, and she also noted that that school is a "recognized school." The plaintiff also testified about the various activities that would be available to the children in the San Antonio community.
With respect to her family members who reside in Rhode Island, plaintiff testified that her mother and father and "all [of her] aunts and uncles and cousins," as well as her grandparents, reside in Rhode Island. As for the relationship between her children and Col. Longo, plaintiff testified that "they interact well each time * * * [and] they are getting more and more comfortable with him."
The plaintiff testified that her relationship with her ex-husband "had been improving since the divorce." However, she added that the relationship "changed when [defendant] learned that [she] had become engaged;" specifically, plaintiff stated that the parties "were not able to communicate anymore." The plaintiff further testified that, after she told defendant about her plans to remarry, she started to have concerns with respect to what defendant might be saying to the children during visitation. The plaintiff testified that "[her older son] specifically would be very emotional" after the visits with his father. She stated that she had concerns about discussions between defendant and the children concerning "moving to Texas, about relocation and liking [her] boyfriend."
When asked a hypothetical question as to how a decision by the court denying her request to relocate the children to Texas would affect her plans, plaintiff testified that she and Col. Longo would still marry, but she added that building a relationship between the children and her fiancé would be "extremely difficult" and "not really practical" due to what would be the long-distance nature of the relationship. The plaintiff also testified that her "number one" goal with respect to establishing a family unit consisting of her children and her fiancé was to "be able to show [her] kids a loving relationship between a man and a woman;" she elaborated as follows:
"I want them to see a loving relationship and * * * how two people can respect each other and work together to love them, to support them, to encourage them to just do their best and be successful in what they choose."
With respect to the importance of the children's maintaining contact with their father, plaintiff testified that she viewed it as "[v]ery important;" she stated that she "want[ed] them to continue a relationship with their father." She testified that her plans with respect to maintaining that relationship were that the children "would continue to have phone conversations with their father nightly or every other night." *1266 She added that "[t]here is also Skype." The plaintiff further stated that "[t]here would also be extended summer vacations" as well as Spring break and major holiday vacations; she also said that she would "welcome [defendant] to come down to Texas anytime he would like * * *." As her last statement on direct examination, plaintiff stated that she would "[a]bsolutely" comply with any visitation schedule that the court might fashion and approve.
On cross-examination, when asked about other arrangements that she had discussed with Col. Longo, plaintiff testified that they had discussed the possibility of her "staying here in Rhode Island with the children and trying to maintain a long-distance relationship;" however, she then said that "that wouldn't be beneficial to the children or [to her and Col. Longo] as a couple trying to maintain a loving, nurturing relationship." The plaintiff did acknowledge that moving to Texas was going to significantly reduce the contact that defendant would have with his children. The plaintiff also admitted that defendant attends most of the children's sporting events and their Cub Scout activities as well as their parent/teacher conferences and doctors' appointments; she also acknowledged that he spends most holidays with them. The plaintiff further acknowledged that, when she took the children to Texas over Christmas vacation, she had notified defendant by e-mail that she was taking the children to Texas and had done so approximately one hour before the scheduled departure time of their flight. The plaintiff also admitted that there had been a few occasions when defendant had asked to have the children outside of his scheduled visitation times and that she had refused to allow him to do so.
The plaintiff also testified on cross-examination that, during the course of the divorce proceedings, their older son had seen a mental health professional in order to address some behavioral problems. The plaintiff further testified that, in September of 2009, that son again showed some behavioral problems and that she again sought counseling for him with a mental health professional.
With respect to the anticipated August 2012 reassignment of Col. Longo, plaintiff testified on cross-examination that she intended to relocate the children and herself in order to be with him wherever he might be assigned. The plaintiff elaborated that she "want[ed] to be a family and the family unit stays together." The plaintiff also acknowledged on cross-examination that her older son had become more emotional since he learned that she would be remarrying. The plaintiff further acknowledged on cross-examination that, upon their divorce, she and defendant had kept their older son attending the same school as previously because "he tends to be an anxious child and I thought that would be best for him." In response to a question concerning the potential for change in the children's relationship with their father if they were to move to Texas, plaintiff responded: "I think their relationship has changed with their father since the divorce, so yes, I would think that their relationship would change some * * *."
On redirect examination, in response to a question as to whether she would have any concerns about her older son making new friends were he to move to Texas, plaintiff answered: "Not at all." She elaborated that "[he] is a resilient kid and he is a very well-liked, popular kid. He makes friends easily."

C

The Testimony of Plaintiff's Remaining Witnesses
Jeannine DiCocco, plaintiff's mother, was the next witness to testify on behalf of *1267 plaintiff. Ms. DiCocco testified that the children "adore their mother." With respect to the children's relationship with their father, Ms. DiCocco testified that the relationship was "[b]y and large a good relationship." Ms. DiCocco further testified that she had observed Col. Longo with the children "about 20 times," and she said that she found the children to be "a little hesitant in the beginning * * * but the more that * * * he comes around, the more relaxed I can see them becoming, absolutely."
The last witness to testify on behalf of plaintiff was Lucille Longo, Col. Longo's mother. Ms. Longo testified that she had been in the company of the children "about four times." Ms. Longo testified as follows on the basis of her personal observations of the interactions between the children and Col. Longo: "They act very well. They like Paul and he plays with them. They get along fine."

D

The Testimony of Defendant's Father
The defendant's father, A. Michael DePrete, was the first witness to testify on behalf of defendant.[5] Mr. DePrete testified that he and his wife see the children every time that defendant has visitation with the children, which includes "every Wednesday * * * and every other weekend." He also testified that, on the occasions when the children are with their father for a holiday, he and his wife spend that holiday with their son and the children. Mr. DePrete further testified that he attends "90 percent" of the children's sporting events and that he and his wife attend any event where the children receive awards.
With respect to the relationship between defendant and his children, Mr. DePrete described that relationship as "a bond like I have never seen in my life." He elaborated that "[defendant] just is a wonderful father." Mr. DePrete testified that defendant is "[e]xtremely" involved with his sons. In response to a question inquiring as to how Mr. DePrete would characterize his son's older child, Mr. DePrete testified that he was a "[w]ell-rounded, loving, caring, wonderful child." Mr. DePrete further testified, however, that he had noticed a difference when plaintiff and defendant were going through their divorce; specifically, he stated that the older son was "very upset" at that time. However, he added that by "January of 2009, he seemed to be a little better."
Mr. DePrete further testified that, from that January to July of 2009, defendant's older child had been "more distant." Mr. DePrete elaborated as follows:
"He has been more inward. He is not as bubbly. There is * * * definitely something going on that * * * of course he knows about and that he is upset about."
When asked when he first started noticing a change, Mr. DePrete responded that it was when the older son "found out about Texas and his mother remarrying." Mr. DePrete then testified as to how he himself found out about the engagement of plaintiff and Col. Longo; he stated that defendant came to his parents' home and told them about the engagement and that he "was upset about possibly * * * his children leaving the state and moving to Texas."
When asked how he felt about his grandchildren potentially moving to Texas, *1268 Mr. DePrete stated that he felt "[t]errible" because "[w]e are not going to be able to see them." Mr. DePrete further testified that one of his concerns about the children moving to Texas was that "they are not going to have their true father."
On cross-examination, Mr. DePrete acknowledged that plaintiff had always been civil when he had had exchanges with her. He further acknowledged that the children had a good relationship with plaintiff, and he agreed that he had "[n]o question" that both of his grandchildren loved their mother and their father. He also acknowledged that he considered plaintiff to be a good mother to her children.

E

The Testimony of Defendant
The defendant was the final witness to testify at the hearing. He testified that, as a result of a conversation that he had with plaintiff on August 3, 2009, he had filed a motion and an affidavit requesting that the Family Court issue a restraining order to prevent plaintiff from leaving Rhode Island with his children. The defendant elaborated that, on August 3, 2009, plaintiff had told him that she was getting remarried and that she had also told him that "we are moving;" defendant further testified that, when asked if it was to Texas that she would be moving, plaintiff responded in the affirmative. The defendant further testified that he questioned plaintiff as to why she would take the children away from him and that she responded that she would still send the kids home once a month for a long weekend and that defendant could have extra time with them in the Summer.
The defendant testified that, the next time that he had visitation with his children after receiving the news from plaintiff about her engagement, he did not discuss the move to Texas with them. However, defendant testified that, "towards the end of August," his older son "broke down and started crying" and that he told his son "not to worry about moving to Texas;" he added that he had also told his older son that he would "do everything in [his] power to stop [the children] from going." The defendant further testified that there was never a time when his older son did not cry when the move to Texas came up in conversation.
With respect to his older son's activities with which he was involved, defendant testified that he coaches his soccer team and his baseball team; he added that he was previously a coach for his son's basketball team. He further testified that he was involved in his older son's Cub Scout activities and "[v]arious school activities" as well as church events. With respect to his involvement with his younger son's activities, defendant testified that he was the coach of his soccer team and that he was planning on coaching his T-ball team; he added that he had formerly taken him to swimming classes. The defendant further elaborated that he attends all of his children's parent/teacher conferences; and, when asked whether he attends their sporting events on days on which he does not have visitation, he responded: "I have never missed."
The defendant also testified that, on several occasions after plaintiff informed him of her plans to remarry and to move, he had requested extra visitation time with the children but plaintiff had refused to grant those requests. The defendant further testified that he believed that the then-current visitation arrangements would not continue if the children were permitted to move to Texas. With respect to the potential relocation to Texas, defendant stated as follows: "I just see a *1269 complete breakdown of my relationship with my children if this move is allowed." With respect to whether plaintiff would continue to foster a relationship between defendant and his children if they moved to Texas, defendant testified that, in his opinion, plaintiff was "not going to cooperate and * * * she is going to do everything in her power to prohibit the boys from having contact with me." He also stated that it was his fear that "slowly but surely, all contact will end." With respect to the potential reassignment of Col. Longo, defendant testified that "the potential move scares me, never mind what could possibly happen in two years." The defendant further testified that he had "extreme concerns" about the children potentially moving yet another time; specifically, defendant stated that such a move would be "detrimental" to his sonsand "especially" to his older son. He added that the older son "is not good with change."
The defendant further testified that, if plaintiff were not permitted to take the children to Texas and chose to move there herself, he would "gladly take [his] children and be their primary caretaker which [he is] more than capable of doing."
On cross-examination, defendant testified that he did not have any complaints about plaintiff's involvement in and over-sight of the children's education. The defendant answered affirmatively to the question posed by plaintiff's counsel concerning whether plaintiff "[was] the primary contributor and person who assists [their older son]" on his school projects. When questioned as to the telephone contact he had with his sons when they visited Texas, defendant testified that he "did ask them to call each and every time they landed, and I am pretty sure that that request was allowed." With respect to an acceptable visitation schedule were his children to move to Texas, defendant stated: "[T]here is no acceptable plan that I could foresee with my children being in Texas because it will completely prohibit me from everyday involvement with my children's lives."

F

The Decision of the Hearing Justice and the Subsequent Travel of the Case
On February 12, 2010, the hearing justice delivered a bench decision. After summarizing the testimony of the witnesses and reviewing the exhibits presented by both parties, the hearing justice proceeded to apply the factors elucidated in Dupre v. Dupre, 857 A.2d 242 (R.I. 2004),[6] and in Pettinato v. Pettinato, 582 *1270 A.2d 909 (R.I.1990),[7] in order to determine whether plaintiffs motion to relocate with the children should be granted. He noted that both parents enjoyed "a deep and loving relationship with their children," but he ultimately found that defendant "present[ed] as a much more credible witness" and that plaintiff would not endeavor to actively foster a close and continuous relationship between the children and their father through enhanced visitation. In the end, the hearing justice denied plaintiff's motion to relocate with the minor children to San Antonio. On April 2, 2010, an order denying plaintiff's motion was entered. Thereafter, plaintiff timely appealed.

II

Standard of Review
On review, this Court will not disturb the findings of fact made by a justice of the Family Court with respect to the issue of custody and the best interests of the child unless the hearing justice abused his or her discretion in making such findings. Valkoun v. Frizzle, 973 A.2d 566, 575 (R.I.2009); see also McDonough v. McDonough, 962 A.2d 47, 52 (R.I. 2009); Berard v. Berard, 749 A.2d 577, 579 (R.I.2000). We will affirm such an award unless the hearing justice's factual findings "overlooked or misconceived material evidence or were clearly wrong." McDonough, 962 A.2d at 52; see also Ayriyan v. Ayriyan, 994 A.2d 1207, 1213 (R.I.2010); Valkoun, 973 A.2d at 575.

III

Analysis
On appeal, plaintiff contends that "[t]he plethora of evidence" in this case supports her argument that the hearing justice overlooked or misconceived evidence and was clearly wrong in finding that it was not in the best interests of the children for them to relocate to Texas. The plaintiff argues that the hearing justice erred in his "analysis and application of the principles enunciated by this Court in the seminal case of Dupre v. Dupre," 857 A.2d 242 (R.I.2004). Specifically, plaintiff asserts that, in Dupre, "this Court emphasized that in determining the best interests of the child, the analysis must focus on the *1271 primary custodial family." In support of that assertion, plaintiff cites certain language from Dupre, 857 A.2d at 255. That language appears in the portion of the opinion in which the Court examined and quoted from the American Law Institute's Principles of the Law of Family Dissolution: Analysis and Recommendations (ALI Principles). The language to which plaintiff points is from chapter 2, § 2.17(4)(a) of the ALI Principles, and it is quoted in Dupre, 857 A.2d at 255, as follows:
"The court should allow a parent who has been exercising the clear majority of custodial responsibility to relocate with the child if that parent shows that the relocation is for a valid purpose, in good faith, and to a location that is reasonable in light of the purpose."
The plaintiff further argues that the hearing justice incorrectly focused on "the effect of the relocation on the children's relationship with [their] father and their extended families;" she adds that the findings of the Family Court "merely identify the usual negative repercussions of any relocation, and its conclusion was an expression of preference." According to plaintiff, once the hearing justice determined that the move to Texas "would improve [plaintiff's] quality of life" and was "well-planned," the court was "obligated to consider the feasibility of preserving the relationship between [defendant] and the children through a suitable visitation arrangement." Accordingly, plaintiff requests that the Family Court's order be reversed.
It is a firmly established principle in family law that the "paramount consideration" in relocation cases is the best interests of the child or children. See Dupre, 857 A.2d at 251-52; see also McDonough, 962 A.2d at 52-53 ("[I]n this troubling and very difficult area of relocation, the ever-present beacon, as in all matters relating to the custody of children, is the best interests of the child in light of current circumstances." (internal quotation marks omitted)). In such cases, "[t]he determination of what is in the best interests of a particular child is appropriately placed in the sound discretion of the [hearing] justice." Dupre, 857 A.2d at 256; see also Keenan v. Somberg, 792 A.2d 47, 49 (R.I.2002); Pettinato, 582 A.2d at 913. Furthermore, we have commented that the discretion of a hearing justice in these situations "should not be unduly constrained" in view of the fact that "[i]t is the [hearing] justice who is in the best position to determine what factors may be relevant on a case-by-case basis * * *." Dupre, 857 A.2d at 257; see also McDonough, 962 A.2d at 52.
We have previously had occasion to acknowledge that "[o]f the many emotional consequences attendant upon the dissolution of a marriage, perhaps none is more vexatious than that precipitated by the desire of a parent to relocate with a minor child of the marriage." See Dupre, 857 A.2d at 245. From determining the best interests of the child to considering the competing desires and rights of the parents, "[t]he issue of post-divorce relocation is * * * complex." Id.; see also Brian S. Kennedy, Note, Moving Away From Certainty: Using Mediation to Avoid Unpredictable Outcomes in Relocation Disputes Involving Joint Physical Custody, 53 B.C. L.Rev. 265, 266 (2012) ("When adjudicating relocation cases, the family courts, in applying the `best interests of the child' standard, must balance one parent's ability to continue a close parent-child relationship with the other parent's ability to seek economic and emotional benefits in a new domicile * * *."). For those reasons, we acknowledge the difficult decision with which the hearing justice was confronted; we note that he stated that arriving at a *1272 decision in the instant case "was one of the hardest [decisions that he] has ever made."
In rendering his decision, the hearing justice reviewed each Dupre and Pettinato factor individually; and, in reviewing each factor, he clearly and meticulously pointed to the evidence relating to that factor.
In addressing the first Dupre factor (see footnote 6, supra), the hearing justice noted that the children had resided with plaintiff "as their primary custodian" from the time of the parties' divorce. He reviewed all of the children's activities with which plaintiff was involved, including "their school work, sport activities and other extracurricular undertakings." He stated that "[b]y all testimony that has been heard herein, the Plaintiff enjoys a good and loving relationship with her sons * * *." With respect to the relationship between defendant and the children, the hearing justice noted that the testimony "ha[d] also been glowing." He reviewed the involvement defendant had with his sons' activities, notably with their "various sport activities," which included coaching several of their teams; he further noted that defendant helped the children with their homework and reading. Although the hearing justice recognized that plaintiff's involvement with the children was more centered on activities "where structure and discipline are very important," he concluded that defendant also "enjoy[ed] a good and loving relationship with his children."
With respect to the second Dupre factor (see footnote 6, supra), the hearing justice took note of the evidence that had been presented by plaintiff, which evidence tended to show (1) that adding the children and herself to Col. Longo's medical plan would involve no cost; (2) that, in Texas, plaintiff would be able to be a "stay-at-home mom and avoid the daycare costs;" (3) that plaintiff would more easily be able to pursue her Master's degree in Texas, the acquisition of which would increase her annual salary as a teacher by $4,000 to $5,000; (4) that plaintiff "would have additional time available to volunteer in her children's school[s] and be able to assist in their classes;" (5) that the schools that the children would attend in Texas were "better performing" than the schools that the children were attending in Rhode Island; (6) that, if she was not permitted to relocate with the children, "it would be difficult for the children and [Col.] Longo to build a relationship;" and (7) that the quality of life for both plaintiff and the children would "be better" in Texas.
In discussing the third Dupre factor (see footnote 6, supra), the hearing justice noted that the activities in which the children were involved in Rhode Island "are also available in San Antonio." However, with respect to the activities in Rhode Island, the hearing justice found that "[t]hese activities seem to be extended family events as grandparents also attend the games." With respect to the education of the children, the hearing justice noted that plaintiff "fe[lt] that the San Antonio schools are better than those in Rhode Island." However, with respect to the education of the children in Rhode Island, the hearing justice observed that "[i]t is uncontradicted that [the parties' older son] is doing very well in school" and that all of the evidence indicated that the younger son also was doing well in school. With respect to the emotional development of the children, the hearing justice noted that, according to plaintiff, the parties' older son had had some behavioral issues and that he had previously undergone and was currently undergoing counseling with respect to those issues. The hearing justice stated that Col. Longo had testified that there were services available through the military *1273 "to address any issues" that plaintiff and her children might have upon moving to Texas. The hearing justice also recalled that plaintiff had testified that the older son's "personality would allow him to make new friends and acquaintances in Texas."
Next, the hearing justice discussed the fourth Dupre factor (see footnote 6, supra). He reviewed plaintiff's testimony, in which she proposed that, if permitted to move to Texas, the children would travel to Rhode Island at least once a month to visit with their father for a long weekend. He also noted that plaintiff planned on allocating to defendant additional time with the children during the Summer months; he further noted that plaintiff felt that the travel cost could possibly be shared by adjusting the existing child-support requirements. The hearing justice next reviewed the visitation rights that defendant then had with the children; he noted that defendant had visitation rights on every Wednesday night and on alternate weekends, as well as on certain holidays, with there being additional visitation rights during the Summer. The hearing justice noted that defendant also saw the children at their sporting events and practices and would usually speak with them by telephone on days when he did not see them in person. He observed that defendant had testified that "his contact with the children will be greatly reduced if the children are allowed to move" and that "he will miss the opportunity to be a part of their everyday life." The hearing justice also noted that defendant had stated that "he would gladly assume primary caretaking responsibilities for [the] children."
With respect to the fifth Dupre factor (see footnote 6, supra), the hearing justice noted that "[a]ll relatives including those of the Plaintiff, Defendant and Colonel Longo are living in Rhode Island."
The hearing justice next addressed the sixth Dupre factor (see footnote 6, supra). With respect to plaintiff's reasons for seeking relocation, he found that plaintiff wanted to move in order to be with Col. Longo, whom she planned to marry. He also noted that Col. Longo was required to live in San Antonio until August of 2012 and that, after that date, he "could be required to move elsewhere." The hearing justice observed that plaintiff had testified as to her belief that relocating to Texas would result in a better quality of life for her children. He then noted that defendant was opposed to the relocation because "he feels that life as he and his children have known it would never be the same." The hearing justice elaborated that defendant was worried that, as time passes, his contact with his children would lessen and that he would become "more and more of an outsider;" he added that defendant felt that the distance between Texas and Rhode Island would "make his children become alienated from him." The hearing justice found that, if the relocation were to take place, the current visitation arrangements would have to change and that defendant was "concerned regarding communication with Plaintiff about his children." The hearing justice noted that "even now the Plaintiff does not inform [defendant] of many things involving the children;" the hearing justice then listed a few examples, about which defendant had testified, relative to plaintiff's failure to communicate with defendant.
In addressing the final Dupre factor,[8] the hearing justice noted that that factor involved a review of the Pettinato factors *1274 (see footnote 7, supra), which focus on the best interests of the child. The hearing justice commented on the strength of the relationship that the children had with both of their parents, as well as with their grandparents. He also noted that Col. Longo "seems to get along well with [the] children, and they are continually becoming more and more comfortable with him." The hearing justice found that both children appeared to be well adjusted to their home, school, and community. He also reviewed the mental and physical health of all of the persons involved; he noted that the only evidence presented with respect to that issue was the testimony about the fact that the older child receives counseling, which had first been sought "for help in dealing with his [parents'] divorce" and was then later sought for help in dealing with his mother's remarriage. With respect to the stability of the children's home environment, the hearing justice found that both parties "appear[ed] * * * to keep a safe home and environment for these children here in Rhode Island." The hearing justice further noted that "[t]here [was] nothing to indicate that either party is not morally fit in any evidence that has been presented." Lastly, the hearing justice addressed the "willingness and ability of each parent to facilitate a close and continuous parent/child relationship between the child and the other parent."[9] The hearing justice remarked that he considered that to be "the most important criteria applicable to this case." The hearing justice noted that "[t]he parties now have a strained relationship and their manner and modes of communication leaves much to be desired." After reviewing the testimony with respect to instances where communication between the parties appeared to be problematic, as well as the parties' respective testimony about the effects that relocation to Texas would have on the relationship between the children and their parents, the hearing justice stated as follows:
"Mrs. DePrete testified that she does adhere to the scheduled visitation and will continue to follow orders. The tension between these parties is readily apparent. Defendant, however, presents as a much more credible witness. His testimony that he feels Plaintiff would not vary from the Court Order is believable and it is compelling. The Plaintiff will not likely obstruct visitation by Defendant as it is not in her past history. It is also not likely that she will actively seek to enhance the Defendant's visitation if she is allowed to move. I so find."
After noting that he had "carefully weighed" the evidence, assessed the credibility of the witnesses, and applied both the Dupre factors and the Pettinato factors, the hearing justice recited his findings of fact and ultimately found as follows:
"[D]espite the fact that it may be in Plaintiff's best interests to move to Texas, to cultivate her relationship with her soon-to-be new husband, the Court cannot overlook the long and continuous ties the children have to their current environment and to their extended family that shares this environment, that a move to Texas and the potential benefits of a life-style that may exist there does not outweigh the current life-style the children enjoy here where they are doing well in their schools and have the benefit of their closeness to their extended families and to their father; that it is not in the best interests of the children to allow them to relocate to the State of Texas."
*1275 The hearing justice then concluded in the following words:
"Based upon these findings, it is ordered, adjudged and decreed that the Plaintiff's motion seeking to relocate with the minor children of the parties to San Antonio, Texas is denied. Should she wish to relocate without the children, then the children may be placed here in Rhode Island with their father."
After carefully reviewing the evidence and the well-articulated reasoning of the hearing justice in denying plaintiff's motion to relocate with the minor children to San Antonio, Texas, we hold that the hearing justice did not overlook or misconceive material evidence, nor were his factual findings clearly wrong. The hearing justice thoroughly reviewed each Dupre factor in light of the evidence presented, and he also took the Pettinato factors into account; he then rendered a logical, cogent, and well-reasoned decision.
Furthermore, although the plaintiff has accurately pointed to language from the ALI Principles that is quoted in this Court's opinion in Dupre[10] as support for her assertion that the relocation analysis should focus on the primary custodial family, what she fails to recognize is that this Court did not adopt the ALI Principles in toto; rather, in citing that language, we were merely making note of that well-respected legal organization's contribution to the ongoing discourse on the issue of relocation. See Dupre, 857 A.2d at 255.[11] Not only did this Court in Dupre take into account the perspective of the ALI, but it also considered the thinking of the American Academy of Matrimonial Lawyers; in addition, the Court reviewed the various approaches of our sister states and the approaches suggested by legal scholars, mental health professionals, and social scientists. See id. at 248-51, 255-57. Ultimately, the Court in Dupre held that, in relocation cases, evidence should be presented by the parties with respect to the multiple factors which we deemed to be of significance,[12] and we drew upon concepts contained in several of the above-referenced approaches in the course of fashioning our list of pertinent factors. See id. at 257-59. We also noted that, in making a relocation determination, "[i]t is the [hearing] justice who is in the best position to determine what factors may be relevant on a case-by-case basis * * *." Id. at 257. In the instant case, the hearing justice decided that the factors evidencing the potential benefits of a move to Texas did not outweigh the factors evidencing the benefits of maintaining the children's current lifestyle in Rhode Island. Being mindful of the principle that the hearing justice's discretion should "not be unduly constrained" in his or her determination on the basis of the relevant factors, we perceive no abuse of discretion or clear error on the part of the hearing justice who presided over this difficult case.[13] Accordingly, *1276 we decline to disturb his ruling that relocation of the minor children to Texas would not be in their best interests.

IV

Conclusion
For the reasons set forth in this opinion, we affirm the order of the Family Court. The record may be returned to that tribunal.
NOTES
[1] The parties' two sons were born on September 4, 1999 and March 3, 2005, respectively.
[2] According to plaintiff's Rule 12A statement to this Court, plaintiff and Col. Longo were in fact married on July 10, 2010.
[3] Colonel Longo testified that, if he were to retire from the military after twenty years of service, his approximate retirement date would be January 14, 2018.
[4] The record indicates that, in addition to his other visitation rights, defendant also had visitation with the children every Wednesday.
[5] All references in this opinion to "Mr. DePrete" relate to A. Michael DePrete, defendant's father, and not to defendant himself.
[6] The following is the non-exhaustive list of factors (no one of which is alone dispositive) that this Court set forth in Dupre v. Dupre, 857 A.2d 242 (R.I.2004), as being items concerning which parties involved in a relocation dispute should present relevant evidence:

"(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent.
"* * *
"(2) The reasonable likelihood that the relocation will enhance the general quality of life for both the child and the parent seeking the relocation, including, but not limited to, economic and emotional benefits, and educational opportunities.
"(3) The probable impact that the relocation will have on the child's physical, educational, and emotional development. Any special needs of the child should also be taken into account in considering this factor.
"(4) The feasibility of preserving the relationship between the non-relocating parent and child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
"* * *
"(5) The existence of extended family or other support systems available to the child in both locations.
"(6) Each parent's reasons for seeking or opposing the relocation.
"* * *
"(7) In cases of international relocation, the question of whether the country to which the child is to be relocated is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction will be an important consideration.
"(8) To the extent that they may be relevant to a relocation inquiry, the Pettinato factors also will be significant." Dupre, 857 A.2d at 257-59 (citations omitted).
[7] The following are the factors set forth in Pettinato v. Pettinato, 582 A.2d 909 (R.I.1990):

"1. The wishes of the child's parent or parents regarding the child's custody.
"2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
"3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.
"4. The child's adjustment to the child's home, school, and community.
"5. The mental and physical health of all individuals involved.
"6. The stability of the child's home environment.
"7. The moral fitness of the child's parents.
"8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent." Id. at 913-14 (footnotes omitted).
[8] We note that the hearing justice did not address the seventh Dupre factor, which factor is applicable only in cases of a requested international relocation (see footnote 6, supra).
[9] The quoted language is from Pettinato, 582 A.2d at 914.
[10] See Dupre, 857 A.2d at 255.
[11] We have never viewed the ALI Principles as chiseled in stone. Rather, we have considered them to be points for consideration with respect to the issue of relocation, but not as mandates to be adhered to in a slavish or myopic manner. It is also noteworthy that a scholarly commentator on the ALI Principles has expressly described them as "a work in progress." See Barbara B. Woodhouse, Child Custody in the Age of Children's Rights: The Search for a Just and Workable Standard, 33 Fam. L.Q. 815, 830 (1999).
[12] See footnote 6, supra, where we set forth the (non-exhaustive) list of factors as to which parties involved in a relocation controversy should present relevant evidence.
[13] We commend the hearing justice for the intelligent and sensitive manner in which he analyzed the several relevant factors that this emotionally charged case called upon him to consider.