**Supreme Court**

No. 2014-355-Appeal.
(KP 01-9)

In re Estate of William B. Ross.          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Estate of William B. Ross.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  This case is before the Court on appeal by the children of William B. Ross: namely, William B. Ross, Jr.,[1] Glen E. Ross, and James C. Ross (collectively, plaintiffs).  In appealing the probate of their father's estate, they challenge the fifth and final accounting of the decedent's guardian and sister, Nancy D. Howard.[2]  Lois E. Sanford, another sister of the decedent, was also named a defendant to the probate appeal because she was the co-executrix of William's estate along with Howard.  Before this Court, the plaintiffs assert that the trial judge erred in her assessment of the law and the evidence, and they advance several arguments that Howard breached her fiduciary duty, failed to correct a conflict of interest, and violated G.L. 1956 § 33-17-1 and G.L. 1956 § 33-18-27 in failing to obtain approval for the fifth

---

[1] Although William testified that his family did not refer to him as junior, we have added the suffix for the purpose of clarity in this decision.

[2] The underlying case in this appeal, KP 01-9, was consolidated for trial with case KC 04-644. Although plaintiffs' notice of appeal from the combined judgment entered in those cases lists both case numbers, an appeal fee for each of these three plaintiffs was paid only in the KP 01-9 case.  Accordingly, the papers transmitted to this Court pertinent to case KC 04-644 were remanded to the Superior Court and are not part of the record before this Court.  See State Water Resources Board v. Howard, 729 A.2d 712, 714 (R.I. 1999) (holding that "[c]auses of action, although consolidated, remain distinct throughout trial and in the event of an appeal, a notice of appeal must be filed for each action." (citing Martin v. Lilly, 505 A.2d 1156, 1159 (R.I. 1986)).

and final accounting of decedent's estate. This case came before the Supreme Court on November 3, 2015, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. We conclude that cause has not been shown and that the appeal may be decided at this time. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court in all respects.

**1**

**Facts and Travel**

In 1958 William B. Ross, decedent, was a member of the United States Army stationed in Greece, where he lived with his wife, Emily Ross, and their three young sons, James, William, Jr., and Glen.[3] At some time during that year, William suffered a massive cerebral hemorrhage; he subsequently underwent two brain surgeries, including a frontal lobectomy, and he was eventually transferred to a facility in Brockton, Massachusetts. As a result of the brain trauma and surgeries, William experienced a substantial loss to his short-term memory. In 1959, his wife was appointed as the guardian of his person and estate. While he resided at the facility in Brockton, his doctors determined that William was incompetent and severely mentally impaired, with a prognosis that there was a reasonable likelihood that he would remain severely impaired and would not regain the ability to function in society in a reasonable manner.

William's sons testified that, during his stay at the facility, they visited their father in Brockton approximately once each month, but that William was unable to engage in any sort of conversation with them and that he did not even recognize them. Around 1965, however, William experienced a remarkable improvement in his functionality. James testified that he

---

[3] We will identify several of the parties in this case by their first names for the sake of clarity, due to the fact that this case deals with an estate and several family members have the same surname. No disrespect is intended.

remembered visiting the Brockton facility one day when suddenly his father recognized them all, knew they were coming to visit, and was conversing with them. William was reevaluated by the Department of Veterans Affairs (VA), which determined that William was functioning at a sufficient level to be released to live with his parents.

In 1964 Emily resigned as William's guardian, and, around that same time, the couple divorced. Soon after, Citizens Trust Company was appointed guardian of the decedent's estate and attorney Jeremiah Jeremiah[4] was appointed as the guardian of his person; the decedent was rated as 100 percent disabled by the VA. However, in 1971, William was again evaluated by the VA and determined by Dr. Robert Hyde to be competent. Both Citizens and Jeremiah were discharged as William's guardians.

Between 1971 and 1992, William maintained his competency designation and remained without a guardian. Between 1980 and 1991, William purchased several annuities and opened a number of investment accounts, designating various beneficiaries among his three sons, the plaintiffs, and his two sisters, defendants Nancy Howard and Lois Sanford. William also executed a Last Will and Testament. Until the mid-1980s, William's parents had been providing for his welfare and assisting him with financial investments, but, around 1985, Howard testified, her father suffered an abdominal aneurism and about a year or two later her mother was stricken with a heart attack. At that time, Howard, in an unofficial capacity, stepped in to care both for her parents and her brother.

In 1992 William was again determined to be incompetent by the VA, and his sister, Howard, was appointed by the VA to be his "legal custodian." As legal custodian, Howard had control of William's finances, investments, and estate. In 1994, at the suggestion of the VA, she

---

[4] The late Jeremiah Jeremiah later became the Chief Judge of the Rhode Island Family Court.

petitioned the probate court to appoint her as William's guardian. The petition was granted, and, pursuant to that appointment, she was required to file yearly accountings of all William's investments. William died on May 31, 1999.[5]

Howard testified that she initially was appointed to be William's legal custodian at the request of the VA, due to the growing size of his estate. Howard prepared an accounting of her brother's assets at the time of her appointment. At that time, the estate was valued at approximately $416,000. Each year after that, Howard prepared a yearly inventory of her brother's investments and accounts, providing a total accounting of his estate to both the VA and the East Greenwich Probate Court. The fifth and final accounting was submitted in 1999, shortly after William passed away, at which point the estate contained approximately $920,000. William's three sons filed an objection to the final accounting in the probate court, but on December 21, 2000, the probate judge entered a consent order allowing the guardian's accounting without prejudice to the contestants' right to appeal to the Superior Court.

Plaintiffs filed a notice of probate appeal in Kent County Superior Court on January 5, 2001, listing as reasons for appeal that the guardian, Howard, had violated her fiduciary duty to the decedent, had committed fraud, and had a conflict of interest in making the determination of what assets to include in the decedent's estate.

A nonjury trial was held before a trial justice in the Kent County Superior Court. William's three sons and two sisters each testified at the trial. The parties also presented the testimony of Thomas F. Flynn, the Ross family's financial advisor, and Dr. Andrew Rosenzweig, a geriatric psychiatrist. The deposition of another psychiatrist, Dr. William B. Land, was admitted as a full exhibit by agreement of the parties.

---

[5] William's will was admitted to the East Greenwich Probate Court and without objection; Howard and Sanford were appointed co-executrixes of his estate.

- 4 -

William, Jr. testified that, from the time his father moved in with his grandparents, his father's condition was improved but he remained confused, experienced memory loss, and acted like a person with Alzheimer's disease and "as if he was the best disciplined eight-year-old boy." He testified that he got along very well with his aunts, but he explained that, prior to 1994, he had no knowledge of his father's assets or whether he had any interest in those assets, nor that his father had been under a guardianship at any point.

James, William's oldest son, testified that he clearly remembered visiting his father in Brockton and the day that his father's condition drastically transformed. However, he said that his father never returned to be the man he had been before his brain injury; an intelligent, athletic, gifted man who spoke three languages, and had been an honor student. James said that his father retained some of his language abilities but otherwise was unable to remember daily events. James said that he had lived with his father and grandparents on at least two occasions, for at least a year following his high school graduation in 1969 and again around 1990 for a year or more.

James also testified that, at some point in the 1980s, he was approached by his aunts, his grandmother, and his father about his father's assets. He said that they showed him a document that listed his father's assets, such as stocks that he owned. The document also laid out who the stocks were "being appropriated to" among himself, his brothers, and his aunts. He said they explained that his father's worth had reached a point where they felt that investing his money would result in a better return. He testified that his family "meant for me to be proud, and I was, that my father had acquired this much monies and that it was being invested and that he was looking towards, well, not only his own future but that he was making preparations for my future and my brothers' futures." According to James' testimony, the accounts totaled approximately

$180,000, and he was told that they were set up so that he and his brothers would each receive 30 percent of his father's assets and each of his aunts would receive 5 percent. He recalled being asked if it bothered him that his aunts were receiving some money and he explained his feelings at the time as follows:

> "I always felt that * * * they were there when we were children, especially on a much more permanent basis or on a basis where they saw him and met his needs if he had any, and I'm sure they too, like, they were saddened by how his condition had deteriorated * * * but, of course, they were always kind, they showed him much love, and it was evident to me as a child and later as an adult, I never saw their affection or their loyalty, let's say, to their brother decline, it never did, I mean, and I always felt that they had his best interest at heart, and I trusted them completely."

He additionally testified that, when he returned to live with his father and grandparents, his father's condition was the same; he could not converse about current events but he had a routine that he followed every day. For approximately ten years, his father had a job at E.A. Adams Jewelry Company, to which he would take the bus.

James said that, while he was living with his father and grandparents from 1990 to 1991, it came to his attention that his father was paying for a private life insurance policy. Because his father had served in the military, James believed that the VA should be paying for the policy as part of his father's disability benefits. During the course of getting the VA to take over the policy, James, with the permission of his father, grandmother, and Howard, also changed the beneficiary form to include Glen's two children, William's grandchildren. James also learned that his father had been seeing several private physicians and dentists and believed that he should have been obtaining that care for free through the VA. James also discovered at that time that his father had been found to be competent at some earlier time, much to James' surprise, and he began to inquire further about how that had happened, including requesting medical records from

the VA.  However, he did not inform his grandparents or aunts that he was making such an inquiry.

James testified that at some time in 1994 he received a letter from Howard explaining that the VA had asked her to assist his father and stating that she was responsible for a yearly fiduciary accounting on his behalf.  He said that he was upset by the letter because it was the first time he heard anything about the VA contacting his aunt, and he was troubled that the agency would have contacted her and not any of William's sons.  He said that his brother Glen was particularly upset, but James said that he tried to calm his brother down by explaining that his aunt was with their father daily, that she was doing things for him, and that he "had every faith in [his] aunt to do the right thing for [his] father."

James also said that he had frequently borrowed money from William over a period of nearly thirty years, totaling approximately $35,000.  James repeatedly said that his father would understand at the time when his family discussed financial matters with him, such as when James asked to borrow money from his father or the family talked to him about changing the beneficiary form to include his grandchildren.

Finally, James testified that he had no knowledge that his aunts ever misappropriated funds from his father, but, nonetheless, he believed that his aunts had changed some documents so that he and his brothers "lost a significant amount of [his] father's estate."  After his father died, James received no more than $70,000, and he believed his brothers received the same amount.

Glen testified that he remembered his father as not being very communicative, that he usually just sat and watched television, and that, to his knowledge, his father's condition did not improve much over time.  Glen acknowledged that he received a letter advising him that there

was a hearing scheduled on August 18, 1994, to address the appointment of a guardian for his father, but that the letter said it was not necessary for him to attend and so he did not attend. He testified that he did not receive an accounting or inventory that was supposed to have been attached to that letter. He explained that at the time he had no knowledge of the contents of his father's estate or of any of his investments.

Finally, Glen testified that in 1987 he and his fiancée, Mary, wished to purchase a house, but that his credit was very bad. He spoke to his aunt, grandmother, and father about using his father's good credit to help them secure a mortgage. Eventually, they purchased a house in William's and Mary's names only. His father also signed an agreement with Mary and Glen, concerning the house and repayment terms. Glen admitted that his father understood the basic provisions of the agreement as well as he himself did, since he also did not understand much of the "legal jargon" in the agreement.

Sanford, decedent's sister, testified that her brother did not discuss financial matters with her; indeed, she said that she was unaware that he was under a guardianship. She said she believed that her mother had taken care of his finances for many years, until Howard took over. Sanford also testified that at some point she became aware that her brother had created a checking account designating her as a joint owner, but that at the time she had no knowledge of it and did not know why she was listed as an owner. The only investment that she knew of at the time was in 1971 when her brother placed $7,000 in a certificate of deposit in her name. Finally, she testified that she received approximately $360,000 from her brother's estate and that the money had been expended.

Howard was questioned at length about her brother's condition and her knowledge of his investments; however, she had very little memory of the details of each investment. Regarding

William's condition after he moved in with his parents, she explained that, at a certain point in the 1980s, her brother was able to start driving a car again and he obtained employment at E.A. Adams in Pawtucket. She further testified that he was active in his church, was involved in a retired senior volunteer program, and was a member of a bowling league. She said that he could speak Greek fluently up until the time of his death.

Howard testified that, although she could not remember any of her brother's investments with particularity, "It's not my custom to sign things I don't know what I'm signing." She said that she discussed all the investment changes with her brother and Thomas F. Flynn, and that she never went to the investment firm without her brother. She identified a letter she wrote to Glen, William, Jr., and James, dated June 22, 1994. In her letter, Howard explained that she had been serving as decedent's legal custodian with the VA since 1992 at the VA's recommendation.

Howard testified that, during her term as her brother's guardian and fiduciary, she did not change any of the beneficiary designations on his accounts. She maintained that however the assets were designated in terms of ownership or beneficiaries at the beginning of her involvement was how they remained until her brother's death, even though the investment vehicles may have been changed from time to time. She further testified that, to her recollection, at no time did any of her brother's children contact her to inquire about the investments.

Thomas F. Flynn testified that he had served as a financial advisor to the decedent and stated that he had met with the decedent, who signed various documents and applications for funds in Mr. Flynn's presence. He testified that the decedent appeared to understand what he was signing.

Doctor Andrew Rosenzweig, a geriatric psychiatrist, who reviewed the decedent's VA medical records, testified that he saw no evidence in the records he had reviewed that anyone had

exerted undue influence on the decedent, nor anything to indicate that the decedent was not competent at the time his will was signed. He further testified that, to a reasonable degree of medical certainty, the decedent would have understood who the beneficiaries of his assets were and would have understood his decisions surrounding such designations at the time he was making them.[6]

At the conclusion of the evidence, the trial justice rendered a bench decision, finding in favor of defendants on all claims. She found that Howard did not breach her fiduciary duties as guardian or in rendering her fifth and final accounting of the guardianship estate.

The trial justice conducted a detailed review of the facts and procedural history of the case and the evidence, including the testimony of William B. Ross, Jr., James C. Ross, Glenn E. Ross, Dr. William B. Land, Lois E. Sanford, Nancy D. Howard, Dr. Andrew Rosenzweig, and Thomas F. Flynn. The trial justice first addressed the issues raised in the 2004 case that is not before this Court.[7] Regarding the appeal filed by plaintiffs with respect to the consent order entered in East Greenwich Probate Court on the fifth and final accounting that is before this Court, the trial justice found that plaintiffs "failed to satisfy their burden of demonstrating that Howard breached her fiduciary duty."

---

[6] The trial justice found that there was no critical difference between the conclusions of Dr. Land and Dr. Rosenzweig.

[7] Because this appeal arises out of case KP 01-9, which was plaintiffs' probate appeal from the order approving Howard's fifth and final accounting, the trial justice's analysis of the claims alleged in case KC 04-644, including breach of fiduciary duty, undue influence, and fraud, will be discussed here only as needed for context as to the issues raised in this appeal. The trial justice disposed of the undue-influence claim that is not subject to this appeal, finding that "[u]pon review of the totality of the circumstances, there [was] no evidence to suggest a scintilla of undue influence," and that, "[t]o the contrary, the overwhelming evidence shows that the decedent acted independently and with full knowledge in reaching a fair, proper and reasonable disposition of his assets."

- 10 -

As to the claim that Nancy Howard breached a fiduciary duty through a scheme by which she wrongfully transferred funds or beneficiary interests to herself and her sister, the trial justice found that, although Howard owed a fiduciary duty to the decedent, plaintiffs did not prove that she had breached that duty. The trial justice found that "there's no evidence that Howard changed the beneficiary designations on the decedent's accounts." She further found that because Sanford did not owe a fiduciary duty to William, there was no reason to address those claims alleged by plaintiffs against her.

The trial justice found that the fees that Howard received for her services as guardian, totaling $2,127.50, were not unreasonable. She also found that there was no evidence that Howard used income or other assets of the estate for her own purposes, or for anyone else's personal support or maintenance. Therefore, she ordered that judgment enter in favor of defendants on the alleged breach of fiduciary duty.

Similarly, as to the claim of fraud, she found that plaintiffs had failed to present any evidence that defendants made any false representations to either plaintiffs or the decedent, that no one had been induced to rely on any representations made by defendants that led to their harm. The trial justice further concluded that plaintiffs' posttrial claim that Howard had committed fraud by concealing a conflict of interest had not been pled in the original complaint or the amended complaint, and thus that claim was not considered by the court. Additionally, she found that plaintiffs "failed to establish that defendants engaged in any wrongdoing with respect to the decedent's estate."

Finally, the trial justice addressed plaintiffs' posttrial claim that the decedent lacked the capacity to name Howard and Sanford as joint tenants in some of his investment assets, notwithstanding the fact that this claim had not been pled in either complaint. She found that

plaintiffs' own testimony supported a conclusion that their father had the contractual capacity to perform these designations, "because [the sons] engaged in a multitude of financial transactions with their father during his lifetime and during the relevant time period which they [now] challenge." Specifically, she cited to instances when James borrowed money from his father, and William co-signed documents with Glen so that he could purchase a home, as well as other occasions in which plaintiffs received funds from their father over the course of the years. She also noted that the medical testimony supported the conclusion that decedent had the ability to act on his own behalf during the time period in question.

A judgment entered in favor of defendants, and plaintiffs filed a timely notice of appeal.

**2**

**Issues on Appeal**

Before this Court, plaintiffs broadly argue that the trial justice overlooked or misconceived the evidence presented during the trial. Insofar as this Court can discern, plaintiffs appear to argue, first, that the trial justice erred in concluding that Howard did not breach her fiduciary duty when she renewed certain of decedent's investments at some point after the first accounting with the probate court in 1994. The plaintiffs contend that she was treating those investments as her own rather than those of her ward. Second, plaintiffs claim that the trial justice committed error because she overlooked Howard's failure to disclose a conflict of interest when she filed the guardianship petition in 1994, in which she described William's estate as consisting of "various investments * * * in the name of Ward and various third persons as Joint Tenants with Rights of Survivorship," when she herself was a joint owner of several of those investments.

Third, plaintiffs allege that the proper procedure for veterans' guardianships, found at G.L. 1956 chapter 16 of title 33, was not followed, and that Howard violated § 33-17-1. They further allege that she did not comply with the requirements of § 33-18-27 when she obtained the approval from the probate court for the fifth and final accounting.

**3**

**Standard of Review**

"It is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." Wellington Condominium Association v. Wellington Cove Condominium Association, 68 A.3d 594, 599 (R.I. 2013) (quoting Hernandez v. JS Pallet Co., 41 A.3d 978, 982 (R.I. 2012)). "If, as we review the record, it becomes clear to us that the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for [that of the trial justice] even though a contrary conclusion could have been reached." Id. (quoting Hernandez, 41 A.3d at 982). "Pure questions of law, however, we review on a de novo basis." Lamarque v. Centreville Savings Bank, 22 A.3d 1136, 1140 (R.I. 2011) (citing Cathay Cathay, Inc. v. Vindalu, LLC, 962 A.2d 740, 745 (R.I. 2009) and Ondis v. City of Woonsocket ex rel. Treasurer Touzin, 934 A.2d 799, 802 (R.I. 2007)).

**4**

**Discussion**

**A**

**Breaches of Fiduciary Duty**

The plaintiffs argue on appeal that the trial justice misconstrued material evidence when she found that defendant Howard did not breach her fiduciary duty to William.[8] The plaintiffs assert that the trial justice erroneously relied on Howard's testimony that she had no role in determining the beneficiary designations. Although much of their written submissions to this Court focus on defendant's conduct after she was appointed the legal guardian, plaintiffs further contend that she acted as a de facto guardian for her brother as early as 1980. The plaintiffs also appear to argue that defendant Howard's failure to disclose her purported conflict of interest constituted a breach of her duty of loyalty that is a fundamental aspect of the fiduciary relationship. The defendants respond that the trial justice's findings were supported by competent evidence, that plaintiffs failed to demonstrate how the trial justice misconceived material evidence, and that Rhode Island law does not prohibit a guardian from being a joint tenant on the investments of a ward.

Insofar as plaintiffs argue that defendant's fiduciary duty began prior to her appointment as guardian by the probate court, this Court will not address such an argument because it is clear from the trial justice's decision that it was not argued at the trial court level.[9] The trial justice

---

[8] Although plaintiffs' notice of appeal pertains to both defendants, plaintiffs' briefs do not develop or even assert any challenges to the trial justice's decisions pertaining to defendant Sanford. As such, this Court will discuss plaintiffs' arguments only as they pertain to defendant Howard.

[9] This Court "will not entertain on appeal an issue that the aggrieved party did not specifically raise before the trial court." Town of Richmond v. Wawaloam Reservation, Inc., 850 A.2d 924, 930 (R.I. 2004).

specifically said that "[p]laintiff argues that Howard had a fiduciary relationship with the decedent when she was named guardian by the East Greenwich Probate Court." Thus, we will only address plaintiffs' claim that Howard breached her duty at some time between 1992 and William's death in 1999.

This Court has acknowledged that a fiduciary relationship can arise either by virtue of a strong personal or familial relationship of trust or by formal relationships, such as the appointment of a guardian by a court. See Connor v. Schlemmer, 996 A.2d 98, 109 (R.I. 2010) (discussing constructive trust as an equitable solution in situations where a violation of a fiduciary or confidential relationship occurs); see also chapter 16 of title 33 (establishing veterans' guardianships). "If a fiduciary duty is found, such duty 'is one of trust and confidence and imposes the duty on the fiduciary to act with the utmost good faith.'" Notarantonio v. Notarantonio, 941 A.2d 138, 145 (R.I. 2008) (quoting Hendrick v. Hendrick, 755 A.2d 784, 789 (R.I. 2000)). "A fiduciary duty is a duty of loyalty; it is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." 37 Am. Jur. 2d Fraud and Deceit § 35 at 64 (2013).

The trial justice concluded, and neither party disputes, that Howard owed a fiduciary duty to William when she was appointed as guardian for William. However, the trial justice made several critical findings in addressing plaintiffs' several contentions that Howard breached that duty. First, the trial justice found that Howard's testimony was credible, but that much of the testimony from the three plaintiffs was self-serving and unconvincing. In response to plaintiffs' suggestion that Howard engaged in self-dealing when she changed the beneficiaries of the decedent's annuities and/or life insurance policies, she concluded that there was no evidence on the record that Howard changed any beneficiary designations. She found that "the evidence

- 15 -

indicates that the beneficiary designations on the decedent's accounts remained as initially established by the decedent." Furthermore, the trial justice found that the actions taken by Howard to exchange investment vehicles for several of the accounts were "aimed at appreciating the decedent's estate [and] indicate prudent behavior and sound judgment."

The plaintiffs now ask this Court to disregard or find error in the trial justice's findings of fact and determinations of credibility. As mentioned above, and on countless occasions by this Court, "the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." Wellington Condominium Association, 68 A.3d at 599 (quoting Hernandez, 41 A.3d at 982). "[W]e 'accord a substantial amount of deference to th[e] [credibility] determinations, due to the fact that the trial justice * * * has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.'" D'Ellena v. Town of East Greenwich, 21 A.3d 389, 392 (R.I. 2011) (quoting B.S. International Ltd. v. JMAM, LLC, 13 A.3d 1057, 1062 (R.I. 2011)).

"[W]e shall not substitute our view of the evidence for [the trial justice's] even though a contrary conclusion could have been reached." Cullen v. Tarini, 15 A.3d 968, 977 (R.I. 2011) (quoting Imperial Casualty and Indemnity Co. v. Bellini, 888 A.2d 957, 961 (R.I. 2005)). Furthermore, we can discern absolutely no evidence from the record that would contradict the trial justice's findings that William "acted independently and with full knowledge in reaching a fair, proper and reasonable disposition of his assets" and that "during her time as guardian for the decedent Howard only made changes as to investments themselves to maximize their returns and not to the beneficiary designations."

- 16 -

Notably, the trial justice neither considered nor ruled on plaintiffs' claim that Howard committed fraud by concealing a conflict of interest because it was not pled in the original complaint or the amended complaint filed in the 2004 lawsuit. The trial justice identified only a claim of breach of fiduciary duty in the 2001 probate appeal. However, the appeal that is before us asserted both a breach of fiduciary duty claim and an allegation that the "Guardian * * * and her counsel are now in a conflict of interest to determine the proper inclusion of assets in Decedent's estate which is pending in East Greenwich Probate Court." The plaintiffs reiterate their argument before us that Howard's concealment of her conflict of interest is actionable in this Court; however, they couch the violation as a breach of fiduciary duty.

We have held that a trial justice's failure to rule on an issue raised in the trial court is an error, but this Court may still address the issue if it presents a pure question of law. See Power v. City of Providence, 582 A.2d 895, 900 (R.I. 1990) ("Once again, the arguments that the parties have presented relate solely to questions of law. The trial judge erred in failing to rule on the legal question of whether the settlement agreement is invalid on the basis that it contravenes the act."). Indeed, in Notarantonio, 941 A.2d at 145, we said that "[a]lthough [the trial justice] did not specifically address the claim of breach of fiduciary duty, her findings of fact for all intents and purposes preclude a finding that [the defendant] breached any such duty." We find that reasoning to be equally applicable regarding plaintiffs' conflict of interest allegations in this case.

Here, plaintiffs argue that Howard breached her fiduciary duty when she failed to disclose to the probate court that she was a joint owner on some of decedent's investment accounts because, had she made such a disclosure, such an apparent conflict of interest would have precluded her appointment as guardian. The plaintiffs argue that the duty of loyalty

mandated that she eradicate any such conflict of interest by removing herself as a joint tenant from those accounts.  Howard responds that there is no basis in Rhode Island law that would prevent a guardian from being a joint tenant of the ward's property.

Several legal principles are relevant to the issues raised by plaintiffs, and a few courts have directly addressed the issue of a guardian's joint ownership of the ward's accounts.  First, we are of the opinion that "[a]s a general rule, close relatives are preferred as guardians or conservators of incompetent persons since they are regarded as the ones most solicitous of the ward's welfare and the ones most likely to rehabilitate the ward."  39 Am. Jur. 2d Guardian and Ward § 41 at 48 (2008).  Under Rhode Island's Limited Guardianship Statute, relatives or friends of incapacitated individuals are eligible to be appointed as guardians, and the statute specifically provides that "the court should consider the wishes expressed by the individual found to be incapacitated as to preferences among individuals eligible to serve as limited guardian or guardian."  General Laws 1956 § 33-15-6(c), (e).[10]  In situations where the spouse is the preferred guardian, either by statute or by the ward's own request, joint accounts and investments would necessarily be involved.  Were that to automatically invalidate a guardianship or require the guardian to remove herself from all jointly owned accounts, it would run counter to the public policy favoring close relatives as guardians and would likely invalidate many existing guardianships.

The plaintiffs rely heavily on a decision of the Court of Appeals of Georgia, wherein the court found that a guardian and joint tenant had breached his duty of loyalty, explaining:

_____

[10] The trial justice acknowledged that the guardianship was subject to the provisions of the Uniform Veterans' Guardianship Act, which provides that "[e]xcept where inconsistent with this chapter, laws of this state relating to guardian, ward, and the judicial practice relating thereto, including the right to trial by jury and the right of appeal, shall be applicable to beneficiaries and their estates."  General Laws 1956 § 33-16-32.

> "since the guardian, as an individual, was joint tenant with his
> ward with right of survivorship as to the savings accounts, * * *
> there can be no doubt that he occupied a conflict-of-interest
> position and was thus in violation of his duty of loyalty, as he
> stood to gain personally by preserving the savings accounts and
> taking the balance as the survivor." Dowdy v. Jordan, 196 S.E.2d
> 160, 165 (Ga. Ct. App. 1973).

Although it is true that in that case the guardian inappropriately drained the ward's individual accounts while maintaining the entirety of the joint account for himself, it is also true that the court rested its decision that the guardian breached his fiduciary duty on the acceptance of the trust from the beginning because of the joint account. Id. at 165-66. The court reasoned that there is "a duty to refuse the trust, or resign, or to remove the conflicting personal interest. He cannot prevent the existence of the conflict of interest, but he can immediately remove it." Id. at 166 (quoting Bogert, Trusts and Trustees § 543 at 478 (2d Ed.1960)).

However, other courts addressing the issue have turned away from such a strict approach. The Kansas Court of Appeals declined to adopt a strict rule that a conflict of interest posed by a guardian's dual status as joint tenant and guardian should compel forfeiture of her right of survivorship. Fielder v. Howell, 631 P.2d 249, 251 (Kan. Ct. App. 1981). There, the defendant was appointed guardian of her father's estate several years after being made a joint tenant with right of survivorship on a certificate of deposit by her father. Id. at 249-50. On the same day that she was appointed guardian, she withdrew the proceeds of the certificate and deposited them in a joint checking account with her husband. Id. at 250. The court specifically distinguished the situation from that present in Dowdy, reasoning that she had a right to the money in the account as a joint holder, that she had been entrusted as a joint owner by her father for several years before his incapacitation, that she spent money from the joint account to pay for her father's expenses during the guardianship, and that there was no liquidation of other assets of the estate.

Id. Therefore, the court held that "when the estate of the ward is in no way diminished and the apparent conflict of interest does not manifest itself by controlling the guardian's actions, it would seem unduly harsh to make an example of a loyal fiduciary because of a potential, yet unrealized, conflict." Id. at 251.

We find the reasoning of the Kansas Court of Appeals to be persuasive. In light of the trial justice's factual findings in this case—that Howard did not apply any monies from the income of the estate in support of herself or any person other than the ward, and that all evidence pointed to her properly attending to her duties with the assistance of Flynn—there was no evidence that Howard acted in any way that was detrimental to the estate or its beneficiaries. Had Howard not been appointed as William's guardian, she and Sanford, as joint tenants, would have had the same interest in those joint investments and would have received whatever monies remained in the account at the time of William's death by operation of law. See Robinson v. Delfino, 710 A.2d 154, 161 (R.I. 1998) ("the opening of a joint bank account wherein survivorship rights are specifically provided for is conclusive evidence of the intention to transfer to the survivor an immediate in praesenti joint beneficial possessory ownership right in the balance of the account remaining after the death of the depositor, absent evidence of fraud, undue influence, duress, or lack of mental capacity"); see also Trust of McManus v. McManus, 18 A.3d 550, 553-54 (R.I. 2011) (reiterating holding in Robinson).

**B**

**Violations of Guardianship Statutes**

Finally, plaintiffs assert that Howard violated various provisions of three applicable guardianship statutes. Specifically, plaintiffs allege that the proper procedure for veterans' guardianships found at § 33-16-16, which requires an accounting of all securities and

- 20 -

investments in the probate court, was not followed, and that Howard violated § 33-17-1, which requires that a bond be posted in certain circumstances as the probate court deems necessary. The defendants argue that these allegations were neither contained in the 2001 reasons for appeal nor in the 2004 complaint, nor were they raised in the trial court until plaintiffs' posttrial memorandum. We agree. Because these arguments were not addressed by the trial justice, it is clear to us that they were not properly preserved and they will not now be addressed. See State v. Bido, 941 A.2d 822, 828 (R.I. 2008).

The plaintiffs also argue that Howard allowed for the distribution of assets prior to the probate court's approval of her fifth and final accounting in violation of § 33-18-27, covering decedents' and incompetents' estates. Although we hold that this argument was also waived, we feel compelled to say that, had it been preserved, there would nevertheless be no justiciable issue. Section 33-18-27 provides, in pertinent part, that:

> "If an executor, administrator, or guardian has paid or delivered to the persons entitled thereto the money or other property in his or her hands as required by a decree of a probate court, he or she may perpetuate the evidence of payment or delivery by presenting to the court, within one year after the decree is made, an account of the payments or delivery, together with the vouchers therefor, which shall be kept in the files of the court. The account, being proved to the satisfaction of the court, and verified by the oath of the executor, administrator, or guardian, shall be allowed as his or her final discharge and ordered to be recorded. This discharge shall forever exonerate the executor, administrator, or guardian, and his or her sureties, from all liability under the decree unless his or her account is impeached for fraud or manifest errors."

However, § 33-18-28 says that:

> "If, without an order of court, an executor, administrator, or guardian pays or delivers any money or other property in his or her hands to a legatee, distributee, or ward, and thereafter renders an account, upon oath, with a full and detailed statement, to the probate court, and after notice it appears that the person to whom

- 21 -

> the money has been paid or property delivered would have been entitled to an order of court for the payment or delivery, and that the account ought to be allowed, <u>the probate court may make a decree, which shall have the same effect to exonerate and discharge the</u> executor, administrator, or <u>guardian</u>, and his or her sureties, from further liability as if the payment or delivery had been made under a previous order of the probate court." (Emphases added.)

Furthermore, other than generalized assertions that defendants somehow improperly received decedent's assets, plaintiffs fail to point to any specific instance where any such impropriety occurred or to any asset that was received by anyone other than a person designated by the decedent.

Therefore, we have no difficulty in concluding that the trial justice did not err in finding in favor of the defendants as to the plaintiffs' appeal of the probate court order approving the fifth and final accounting. The plaintiffs failed to produce any evidence to indicate that Howard did anything other than attempt to continue to carry out the decedent's wishes in terms of the appointment of beneficiaries, joint tenants, or other recipients of his assets.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record is remanded to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  In re Estate of William B. Ross.

**CASE NO:**  No. 2014-355-Appeal.
(KP 01-9)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  February 1, 2016

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**  Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Sarah Taft-Carter

**ATTORNEYS ON APPEAL:**

For Plaintiffs:  William G. Savastano, Esq.
Edward J. Mulligan, Esq.

For Defendants: Paul J. Votta, Jr., Esq.
Jennifer A. Niedzinski, Esq.