June 21, 2018

**Supreme Court**
No. 2016-9-Appeal.
(W 11-120)

Lauren Daley Ainsworth          :

            v.                   :

John Ainsworth.                  :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Lauren Daley Ainsworth  :

v.  :

John Ainsworth.  :


Present: Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** The plaintiff, Lauren Daley Ainsworth, appeals from a July 22, 2015 order of the Family Court denying her motion to relocate with the parties' four minor children from Rhode Island to Australia. Her several appellate contentions are summarized later in this opinion.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that cause has not been shown and that this appeal may be resolved without further briefing or argument.

For the reasons set forth in this opinion, we affirm the order of the Family Court.

# I

## Facts and Travel

The plaintiff, Lauren, and defendant, John,[1] were married in Australia on October 2, 1999, and four children were born of that marriage: Hope, Sydney, Jenny, and Jack.[2] Lauren is a citizen of Australia with permanent residency status in the United States, while John is a citizen of the United States; the children have dual citizenship. On March 23, 2011, Lauren filed for divorce on the ground that irreconcilable differences between the parties had led to the irremediable breakdown of the marriage. On October 31, 2012, while the divorce proceedings were pending, Lauren filed a motion to relocate to Australia with the children. On December 7, 2012, a justice of the Family Court issued a decision pending entry of final judgment,[3] which (in pertinent part) awarded joint custody of the children to the parties, with "physical possession" of the children being granted to Lauren and with John having "all reasonable rights of visitation."[4] More than a year later, a different justice of the Family Court conducted a hearing on Lauren's motion to relocate, which hearing took place over the course of five days in July and August of 2014. On August 27, 2014, said justice issued a bench decision denying the motion to relocate; and, on July 22, 2015, a final order denying the motion to relocate was entered, from which Lauren timely appealed. We summarize below the pertinent testimony adduced at the hearing on Lauren's motion to relocate.

---

[1] We refer to the parties by their first names for the purpose of clarity only; we intend no disrespect by doing so.

[2] The record reflects that all four children were born in the United States—Hope in January of 2001; Sydney in July of 2003; Jenny in November of 2007; and Jack in September of 2009.

[3] *See* Rule 1.8 of the Rhode Island Family Court Rules of Practice.

[4] A final judgment granting the divorce was not entered until July 22, 2015; the reason for the delay is not clear from the record.

# A

## The Testimony of Lauren

Lauren testified that, at the beginning, her marriage to John was "really good," but that it began to deteriorate after the first six months—a deterioration that she attributed to John's alcohol abuse. Lauren recounted several instances of John's behavior while he was intoxicated, including several occasions when John allegedly threw various objects at her in the presence of the children. She also testified about John's purported abuse of the family dog and about a recurring situation in which John would allegedly drive up and down the street in front of their home in the presence of the children, "do[ing] burn outs" and "throw[ing] beer bottles." She further testified about an incident in November of 2011, after the divorce proceedings had commenced and while the children were living primarily with her and occasionally visiting John. According to Lauren, on November 18, 2011, John became intoxicated while caring for the children during one of their visits with him. She stated that, on that date, she had received a "hysterical" phone call from Sydney, who said that she "couldn't wake up daddy." Lauren further testified that, upon receiving Sydney's phone call and before driving to John's residence, she had called the police and asked them to check on the children. The police report concerning that incident (a full exhibit at the hearing) stated that, when Lauren arrived to pick up the children, John "became very irate" and lunged at Lauren while "screaming for her to leave."

Lauren next testified that, during the divorce proceedings, both prior to and subsequent to the issuance of the December 7, 2012 decision pending entry of final judgment, she, John, and the children began attending monthly counseling sessions with Dr. Brian C. Hayden. She stated that the purpose of the counseling sessions was to conduct "reunification therapy for all of the children with their father and then co-parenting for John and myself." According to Lauren, these

sessions were successful; she added that, as a result, the Family Court allowed the children to "have unsupervised overnight visitation with their father." However, Lauren further stated that, in spite of the apparent improvement in the relations between the parties, John still used his phone to record his interactions with her whenever she picked up or dropped off the children for visitation.

Lauren explained that she wished to relocate with the children to Australia because such a relocation would offer her significantly better economic prospects and would provide a better quality of life for her and the children and also because she was concerned about her father, who lived in Australia and who had, shortly before the filing of her motion to relocate, been diagnosed with a terminal illness. She testified that, despite the fact that she held a college degree from a university in Australia, she had been unable to find a well-paying, stable job in Rhode Island; she added that, as a result, she worked part-time cleaning houses, earning approximately $250 a week. She stated that, in contrast, she had been offered a management position at a store in Australia, at an approximate annual salary of $60,000. Lauren also testified that, while living in Rhode Island, she and the children had been relying on "food stamps" and heating assistance from the State of Rhode Island; she added that the house in which she resided with the children was then enmeshed in foreclosure proceedings. Lauren went on to state that, if she were permitted to relocate to Australia with the children, she and the children would be able to live in her parents' home, rent-free, which would alleviate many of her financial concerns. Lauren also testified that she intended to seek further education in order to obtain a teaching degree as a way of improving her economic prospects. She testified as to her understanding that it would take "[s]even years part time; four years full time" to obtain a teaching degree in Rhode Island. She further testified as to her understanding that the pursuit of such a degree in Rhode Island would

cost her "[b]etween [$]80,000 and $100,000," and she added that her lack of American citizenship made her ineligible for financial aid in this country. She stated that, in contrast, she could pursue a teaching degree at the University of Wollongong by paying an annual fee of $131.50 for full-time study; and a document reflecting her "Conditional Offer of Admission" to the graduate teaching program at that university was admitted as a full exhibit.

Lauren further testified that she believed that it was "very important for the children to have a strong relationship with both their mother and their father;" and, to that end, she proposed a visitation schedule whereby the children, if they were relocated to Australia, would fly to Rhode Island for visitation with John during their school breaks. She stated that, under her proposed visitation schedule, the children would visit their father in Rhode Island for two weeks in April, two weeks in July, and an additional six weeks in December and January; she clarified that the six-week visit would occur during the Australian Summer, when the school year in that country would be over. Lauren added that, in addition to the several proposed visits to Rhode Island by the children, John would be welcome to visit the children in Australia "whenever he liked."

**B**

**The Testimony of John**

John testified that he had a "wonderful" relationship with his children. After acknowledging that his work as an "offshore fisherman" required regular absences from Rhode Island, John testified that he had been as actively involved in raising the children as he possibly could. He explained that, when he was on shore, he frequently took the children on bicycle rides and camping trips and participated in other outdoor activities with them. He further testified that he opposed Lauren's motion to relocate to Australia with the children because, in his estimation,

it would cause his relationship with the children to "suffer greatly," and he said that he was afraid that the children would grow to resent traveling from Australia to Rhode Island to visit him during their school breaks. He further testified that relocation would negatively impact the children's relationships with his side of the family as well as their relationships with their school and church friends in Rhode Island.

While John admitted that he had suffered from an alcohol problem during his marriage to Lauren, he denied most of the alcohol-related misconduct about which Lauren testified, and he stated that he had never been convicted of the domestic assault charges which Lauren had lodged against him and which had served as the basis for the restraining orders that she had successfully sought. He did acknowledge, however, that, on November 18, 2011, police officers had removed the children from his care because he had, in his own words, "got[ten] drunk and passed out on the floor." He testified that that incident had caused him to become temporarily estranged from his two oldest daughters, but he added that he had remained sober since that date and agreed that he was very proud that he had attended Alcoholics Anonymous.

John testified that, in April of 2012, during one of his visits with the children, he discovered a recording device which had been sewn into the clothing of one of the children; and he said that he believed Lauren was responsible for that device being there. (In an emergency motion filed with the Family Court on April 27, 2012, John had stated that he believed Lauren "ha[d] been serupticiously [*sic*] taping Dr. Hayden[']s sessions as well," and he asked the Family Court to prohibit Lauren from "alienat[ing] the minor children of the parties from their father." Thereafter, the Family Court granted a "conditional [o]rder of removal" providing that the children would be removed from Lauren's care if she continued to "record either audio or video of the minor children of the parties with their father, the counselors, father's extended family or

any service providers during any visitations or otherwise.") John further testified, however, that, despite what he characterized as Lauren's attempts to alienate the children from him, the counseling sessions with Dr. Hayden were able to open the lines of communication between him and his two oldest daughters and that, as a result of the success of those sessions, he now enjoys regular, unsupervised visitation with all four children.

John stated that, when effectuating visitation, the parties would meet in public places to exchange the children, on which occasions he and Lauren did not speak to each other. He further admitted that he regularly used his iPhone to record the pick-up and drop-off interactions with Lauren in order "to protect [himself]" and "to keep [Lauren] honest."[5]

**C**

**The Testimony of the Guardian *Ad Litem***

The guardian *ad litem*, an attorney, testified that she became involved with the Ainsworth family in October of 2011 and that she thereafter submitted two reports to the Family Court: an interim report dated February 24, 2012 and a final report dated July 31, 2014. Both reports were admitted into evidence as full exhibits. In her interim report, the guardian *ad litem* stated that "relocation should only take place [at] a time when the relationship between Mr. Ainsworth and his youngest children has been firmly re-established and all avenues to re-establish the relationship between Mr. Ainsworth and his two older children have been exhausted." In her final report, the guardian *ad litem* noted the practical difficulties that an international relocation would occasion for the parties, in view of the expensive and complex nature of international travel and the parties' limited financial means.

---

[5]     Both John and Lauren testified in considerable detail about the poor quality of their relationship in the past and as of the time of the hearing.  However, we see no necessity for narrating each and every detail of their testimonies in that regard.

The guardian *ad litem* testified that, when she first became involved with the Ainsworth family, the relationship between John and Lauren was "very acrimonious;" and she recounted that, in 2012, Lauren had sewn a recording device into the clothing of one of the children. She added, however, that, since that incident, Lauren had become "very, very cooperative" with respect to arranging visitation and that, as a result, the children had "cemented and enriched" their relationships with John.

When asked about the children's preferences with respect to the proposed relocation, the guardian *ad litem* admitted that, although she believed at least two of the children were old enough to express an opinion on the subject, she had not spoken directly to any of the children in "a long time," estimating that approximately one year had elapsed since she had most recently had a conversation with any of the children. She testified in an internally inconsistent and noticeably halting manner as to the ages of the four children, and she admitted that she was "not sure" what grades the children were in.

The guardian *ad litem*'s final report recommended that Lauren "retain primary placement" of the children and that John continue to enjoy "frequent and liberal visitation" with the children. The final report of the guardian *ad litem* further stated that "relocation to Australia would certainly benefit [Lauren]," but she also noted that relocation would result in the children having only "minimal contact" with John. Additionally, her report stated that "the ability of the children to travel the distance from one continent to another at this point in their lives is very questionable, both from a feasibility and financial standpoint." Although her final written report neither endorsed nor rejected the proposed relocation to Australia, the guardian *ad litem* testified unequivocally at the hearing that, in her opinion, relocation would not be in the best interests of the children.

## D

## The Testimony of Christine McGrane

Christine McGrane testified that she was a registered nurse and that she had previously worked as a school nurse at the elementary school which Hope had formerly attended. She stated that she first encountered the Ainsworth family when Hope was in fourth grade, at which time she had provided Lauren with vouchers to purchase new shoes for the children. She testified that she thereafter kept the Ainsworth family "on [her] radar" with respect to their receiving various forms of assistance from the community, such as food for Thanksgiving, gifts at Christmastime, and heating assistance over the course of several winters.

## E

## The Hearing Justice's Decision

On August 27, 2014, the hearing justice delivered a bench decision spanning twenty transcript pages denying Lauren's motion to relocate.[6] After summarizing the testimony of the witnesses and reviewing the exhibits introduced by both parties, the hearing justice stated that the "seminal question" in this case was "the feasibility of preserving the relationship between the non-relocating parent and [the] children through suitable visiting arrangements considering th[e] logistics and financial circumstances of the parties."[7] He questioned the practicability of Lauren's proposed visitation schedule, which would require that the children make round-trip flights between Australia and Rhode Island several times each year; and he observed that such travel would impose "a very heavy financial burden" on the parties, neither of whom had "an abundance of money." The hearing justice also found that "the testimony as well as the exhibits

---

[6]     A final order denying plaintiff's motion to relocate was entered on July 22, 2015.

[7]     The phrase quoted by the hearing justice is from this Court's opinion in *Dupré v. Dupré*, 857 A.2d 242, 258 (R.I. 2004).

presented in this case [indicated] that [Lauren] would not endeavor to actively foster a close and continuous relationship between the children and their father * * *." The just-referenced finding was an important factor in the hearing justice's ultimate conclusion that relocation would not be in the children's best interests.

## II
## Standard of Review

"It is a firmly established principle in family law that the paramount consideration in relocation cases is *the best interests of the child or children*." *DePrete v. DePrete*, 44 A.3d 1260, 1271 (R.I. 2012) (emphasis in original) (internal quotation marks omitted). The determination of what is in the best interests of the children is "appropriately placed in the sound discretion of the trial justice." *Dupré v. Dupré*, 857 A.2d 242, 256 (R.I. 2004); *see also Pettinato v. Pettinato*, 582 A.2d 909, 913 (R.I. 1990). "On review, this Court will not disturb the findings of fact made by a justice of the Family Court with respect to the issue of custody and the best interests of the child[ren] unless the hearing justice abused his or her discretion in making such findings." *DePrete*, 44 A.3d at 1270. Accordingly, we will affirm the Family Court's ruling "unless the trial justice's factual findings overlooked or misconceived material evidence or were clearly wrong." *McDonough v. McDonough*, 962 A.2d 47, 52 (R.I. 2009); *see also In re Estate of Ross*, 131 A.3d 158, 166 (R.I. 2016).

## III
## Analysis
## A
## The Pertinent Factors

This Court has set forth several factors that the hearing justice must consider in determining the best interests of the children when he or she is confronted with a motion to

relocate. First, the hearing justice must address the eight factors articulated in this Court's

opinion in *Dupré*. Second, the hearing justice must address such of the eight factors articulated in

*Pettinato* as are relevant to the relocation issue. *See Dupré*, 857 A.2d at 257-59; *Pettinato*, 582

A.2d at 913-14.

In our opinion in *Dupré*, we identified the following factors that are to be considered

"whenever a parent seeks to move with his or her children:"

> "(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent. * * *
>
> "* * *
>
> "(2) The reasonable likelihood that the relocation will enhance the general quality of life for both the child and the parent seeking the relocation, including, but not limited to, economic and emotional benefits, and educational opportunities. * * *
>
> "(3) The probable impact that the relocation will have on the child's physical, educational, and emotional development. Any special needs of the child should also be taken into account in considering this factor. * * *
>
> "(4) The feasibility of preserving the relationship between the non-relocating parent and child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties. * * *
>
> " * * *
>
> "(5) The existence of extended family or other support systems available to the child in both locations. * * *
>
> "(6) Each parent's reasons for seeking or opposing the relocation.
>
> " * * *
> " * * *
> " * * *
>
> "(7) In cases of international relocation, the question of whether the country to which the child is to be relocated is a signatory to

the Hague Convention on the Civil Aspects of International Child Abduction will be an important consideration.

"(8) To the extent that they may be relevant to a relocation inquiry, the *Pettinato* factors also will be significant * * *." *Dupré*, 857 A.2d at 257-59.

It should also be noted that we have indicated that "[n]o single [*Dupré*] factor is dispositive" and that "[e]ach case will present its own unique circumstances that a trial justice must balance and weigh as he or she deems appropriate." *Valkoun v. Frizzle*, 973 A.2d 566, 577 (R.I. 2009).

Our earlier decision in *Pettinato* had set forth the following factors that are to be "weighed in the best interests of the child analysis when relevant[:]"

"1. The wishes of the child's parent or parents regarding the child's custody.

"2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

"3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.

"4. The child's adjustment to the child's home, school, and community.

"5. The mental and physical health of all individuals involved.

"6. The stability of the child's home environment.

"7. The moral fitness of the child's parents.

"8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent." *Pettinato*, 582 A.2d at 913-14 (footnotes omitted).

Just as we have said with respect to the *Dupré* factors, we have previously stated that, in assessing the *Pettinato* factors, "[t]he best interests of the child should not be determined by

assessing any one factor;" rather, "[t]he trial justice must consider a combination of and an interaction among all the relevant factors that affect the child's best interests." *Id.* at 914.

Additionally, we accord deference to the sound discretion of the hearing justice in assessing and weighing both sets of factors because "[i]t is the trial justice who is in the best position to determine what factors may be relevant on a case-by-case basis * * *." *Dupré*, 857 A.2d at 257.

## B

### The Arguments on Appeal

Lauren makes three arguments on appeal. First, she contends that the hearing justice clearly erred in assessing the evidence because he gave "too much weight to [John's] present appearance before the Court" and accorded too little weight to his past misdeeds, while also failing to give "adequate consideration" to the economic benefits that relocation would bring about for Lauren and the children. Further expounding on this argument, Lauren also contends that the hearing justice overlooked material evidence by failing to properly take into account the fact that the parties' "utter loathing" for each other resulted in a "significant detriment" to the children. Second, Lauren argues that the hearing justice overlooked or misconceived material evidence when he "failed to acknowledge or address" the testimony of the school nurse (Christine McGrane), who, according to Lauren, had observed "the children at school and socially." Third, Lauren contends that, in determining whether relocation would serve the best interests of the children, the hearing justice failed to properly apply the criteria set forth in the *Dupré* and *Pettinato* cases because there was no testimony about the children's reasonable preferences with respect to the proposed relocation. We shall address each of these arguments in turn.

- 13 -

## C

### The Argument as to the Weight of the Evidence

Lauren's first argument on appeal is unavailing. In our view, the hearing justice appropriately weighed the *Dupré* factors (and the relevant *Pettinato* factors) and then proceeded to render a well-reasoned decision, which properly took into account all of the material evidence presented at the hearing.

In determining whether, as Lauren contends, the hearing justice accorded "too much weight to [John's] present appearance before the Court" during the hearing while according too little weight to his previous misdeeds, we look to the hearing justice's consideration of the first *Dupré* factor—*viz.*, "[t]he nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent." *Dupré*, 857 A.2d at 257. In assessing that factor, the hearing justice explicitly addressed John's former alcohol abuse, finding that "[t]he breakup of [the] marriage was caused by [John's] excessive drinking." However, the hearing justice also acknowledged that, at the time of the hearing, both parents were engaged in meaningful relationships with the children; he found that "these children have a strong bond with their mother" and that John had regular contact and visitation with the children. He further found that John was "a member of [Alcoholics Anonymous]" and that he had been sober "since November, 2011." He further observed that John "ha[d] done everything that the [Family Court had] required to re-establish his relationship with the children after the separation."

Similarly, in assessing Lauren's contention that the hearing justice failed to give adequate consideration to the positive economic benefits of relocation, we note the hearing justice's analysis of the second and third *Dupré* factors. *Id.* at 258. In addressing the second *Dupré* factor

(*viz.*, "[t]he reasonable likelihood that the relocation will enhance the general quality of life for both the child and the parent seeking the relocation, including, but not limited to, economic and emotional benefits, and educational opportunities"), the hearing justice specifically took into account the fact that "there [was] no doubt that * * * relocation would, in fact, serve to enhance the economic standing and well-being of the mother" and that, as a result, "the children's economic standings would also be increased and favorably impacted." *Id.* Likewise, in addressing the third *Dupré* factor (*viz.*, "[t]he probable impact that the relocation will have on the child's physical, educational, and emotional development"), the hearing justice noted that, in view of the fact that the children had lived their entire lives in Rhode Island, where they attended school and were involved in their community, they had been "bonded to Rhode Island." Upon reviewing the hearing justice's findings and keeping in mind the applicable standard of review, we are unpersuaded by Lauren's contention that the hearing justice improperly weighed the evidence with respect to John's "present appearance before the Court" as compared with his past misdeeds or with respect to the potential economic benefits of relocation.

We would add that Lauren's further contention that the hearing justice improperly weighed the impact that the parties' "utter loathing" for each other had on the children is unpersuasive. The hearing justice expressly noted that the relationship between the parties was "horrible to put it mildly," and he found that Lauren and John "d[id] not speak" except by email to arrange visitation, and that "[Lauren] doesn't want to have anything to do with [John]." He cited as an example of the mistrust between the parties the fact that "on more than one occasion, the mother secretly placed electronic recording devices in the clothing of one or more of the children during visitation with their father * * *." He further found that arranging visitation sometimes required between seventeen and twenty-four emails between the parties; and, he

accordingly questioned whether the parties would be capable of arranging international visitation on a regular basis, given the greater complexity inherent in such visitation. Then, after taking into account these considerations and the others previously mentioned, the hearing justice found that the petition for relocation to Australia should be denied.

It should go without saying that the "best interests" criterion requires a considered judgment to be made as to what will *best* serve the children.  That is not to say, however, that the non-prevailing party in this case has failed to articulate legitimate arguments; nevertheless, in the end, a reasoned conclusion had to be made by the finder of fact. Conceivably, another judicial officer might have assessed the evidence in this case differently; but we perceive no reversible error in the conclusions reached by the hearing justice, and we are ever mindful of the principle that "we shall not substitute our view of the evidence for [that of the trial justice] even though a contrary conclusion could have been reached." *Wellington Condominium Association v. Wellington Cove Condominium Association*, 68 A.3d 594, 599 (R.I. 2013) (internal quotation marks omitted); *see also Process Engineers & Constructors, Inc. v. DiGregorio, Inc.*, 93 A.3d 1047, 1052 (R.I. 2014); *Grady v. Narragansett Electric Co.*, 962 A.2d 34, 41 (R.I. 2009); *see generally Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216 (1947) (Black, J.) (stating, albeit in the context of a slightly different procedural issue, that there should be deference at the appellate level to the discretionary determination of "the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart"). After carefully scrutinizing the record, it is our view that the hearing justice pointed to sufficient evidence in the record to support his conclusion that the nature of the parties' relationship militated against allowing Lauren to relocate to a distant country with the minor children. As such, we perceive no error in the weight he accorded to the negative relationship between the parties.

# D

## The Argument as to the Testimony of Christine McGrane

Lauren's second argument on appeal (*viz.*, that the hearing justice overlooked or misconceived material evidence by failing to reference Christine McGrane's testimony in his decision) is also unpersuasive. It is well established that a hearing justice "need not engage in an exhaustive review and analysis of all of the evidence and testimony presented at trial" so long as he or she "make[s] reference to such facts disclosed by the testimony as have motivated his or her conclusion." *Bitgood v. Greene*, 108 A.3d 1023, 1028 (R.I. 2015) (internal quotation marks omitted); *see also H.J. Baker & Bro., Inc. v. Orgonics, Inc.*, 554 A.2d 196, 202 (R.I. 1989) (concluding that the hearing justice need not refer to "every piece of evidence" so long as he refers to "the specific evidence that prompted his decision"). In the instant case, although the hearing justice did not mention Ms. McGrane by name, his decision did refer to the only truly salient aspect of her brief testimony—namely, that Lauren has historically suffered from financial hardships. Specifically, he found that, at the time of the relocation hearing, Lauren was unemployed, "surviving on food stamps and the generosity of friends and church members," and that she was "in the process of having her home foreclosed * * *." The record reflects that the hearing justice properly considered Lauren's financial situation insofar as it was relevant to determining whether relocation would be in the children's best interests. Accordingly, we perceive no reversible error in the hearing justice's not mentioning Ms. McGrane by name in his decision and not delving into the details of her testimony.

**E**

**The Argument as to the Reasonable Preferences of the Children**

With respect to Lauren's third argument (*viz.*, that the hearing justice abused his discretion by failing to hear testimony about the children's reasonable preferences regarding the proposed relocation), we again perceive no error. Lauren bases this argument on the second *Pettinato* factor, which provides that, when passing on a motion to relocate, the hearing justice must consider "[t]he reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference." *Pettinato*, 582 A.2d at 913. Although Lauren correctly notes that the hearing justice did not hear any testimony about the reasonable preferences of the "two oldest of the parties' minor children," it is nonetheless our view that the hearing justice properly assessed all of the *Dupré* factors and the relevant *Pettinato* factors and that he had no duty to act *sua sponte* to seek additional evidence, such as testimony by the children. While we recognize that judicial officers have the authority to call and interrogate witnesses, we are of the opinion that they are not usually obliged to call such witnesses when the parties have opted not to do so. *See* R.I. R. Evid. 614.[8]

In the instant case, after reviewing the evidence presented by the parties and summarizing the controlling law, the hearing justice began his analysis by acknowledging that he had received "no input in this matter from the children," and he attributed the lack of such evidence to the guardian *ad litem*'s inadequate testimony on the subject. He stated that "[t]he Family Court relies on guardians ad litem * * * to advocate for the best interest of the child * * * [and] to bring to the Court's attention the wishes and desires of the children." He found that it had been more than a year since the guardian *ad litem* had spoken with the children, and he expressed that he was less

---

[8]     It is noteworthy that Lauren was represented by counsel (as was John) at the hearing on the motion to relocate.

than thrilled with her inability to adequately represent their interests. The hearing justice then explained that it was his duty to decide Lauren's motion to relocate even in the absence of evidence of the children's preferences, and he proceeded to do just that.

We are of the view that, insofar as Lauren believed that the children's reasonable preferences should have been made known during the hearing, it was her attorney's responsibility to submit evidence of those preferences; counsel's failure to do so did not impose upon the hearing justice an obligation to call the children as witnesses. *See, e.g.*, *Bajakian v. Erinakes*, 880 A.2d 843, 848 n.7 (R.I. 2005) ("It should go without saying that, as between the proponent of evidence and the trial justice, the responsibility for suggesting and advocating for [the admission of particular evidence] falls upon the proponent."). Accordingly, we perceive no error in the hearing justice's assessment of the evidence (or the lack thereof) as to the children with respect to the proposed relocation.

## IV

### Conclusion

Having carefully reviewed the evidence and the arguments of the parties as well as the clearly articulated reasoning of the hearing justice in denying Lauren's motion to relocate with the minor children to Australia, it is our view that the hearing justice did not overlook or misconceive material evidence in reaching his decision, nor were his factual findings clearly wrong. The hearing justice reviewed each *Dupré* factor in light of the evidence presented, and he also considered the relevant *Pettinato* factors; he then proceeded to render a logical and well-

reasoned decision.  Accordingly, we decline to disturb his ruling that relocation of the minor children to Australia would not be in their best interests. *See Dupré*, 857 A.2d at 257.[9]

For the reasons set forth in this opinion, we affirm the order of the Family Court.  The record may be returned to that tribunal.

Justice Indeglia did not participate.

---

[9]    We are impressed by the conscientious manner in which the hearing justice in the Family Court wrestled with the competing considerations at issue in the instant case—a case that he candidly described as having been "extremely difficult for the Court."

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Lauren Daley Ainsworth v. John Ainsworth. |
| **Case Number** | No. 2016-9-Appeal. (W 11-120) |
| **Date Opinion Filed** | June 21, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Raymond E. Shawcross |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Michael P. Lynch, Esq. |
| | For Defendant: <br><br> Steven A. Robinson, Esq. <br> Daniel Chaika, Esq. |